RUTH NEWMARK AND DUDLEY NEWMARK, HER HUS-
BAND, PLAINTIFFS-RESPONDENTS, v. GIMBEL'S IN-
CORPORATED, A CORPORATION, AND SELIGMAN &
LATZ PARAMUS CORPORATION, A CORPORATION OF
THE STATE OF NEW JERSEY, DEFENDANTS-APPEL-
LANTS.

Argued September 9 and September 23, 1969—
Decided November 17, 1969.

*Messrs. Albert E. Fershing* and *Alvin D. Hersh* argued the cause for defendants-appellants (*Mr. Richard D. Bennett,* attorney).

*Mr. Herman B. Packer* argued the cause for plaintiffs-respondents (*Mr. Saul Peres,* attorney).

The opinion of the Court was delivered by

FRANCIS, J. This appeal involves the liability of a beauty parlor operator for injury to a patron's hair and scalp allegedly resulting from a product used in the giving of a permanent wave. The action was predicated upon charges of negligence and breach of express and implied warranty. Trial was had before the county district court and a jury. At the close of the proof, the court ruled as matter of law that the warranty theory of liability was not maintainable because in giving a permanent wave a beauty parlor is engaged in rendering a service and not a sale; hence re-

sponsibility for injurious results could arise only from negligence. Consequently the court dismissed the warranty counts and submitted the issue of negligence for the jury's determination. Upon the return of a verdict for defendants, plaintiffs appealed. The Appellate Division reversed holding that a fact issue existed requiring jury decision as to whether there was an implied warranty of fitness of the lotion applied to Mrs. Newmark's hair and scalp for the purpose of producing the permanent wave.[1] *Newmark v. Gimbel's Inc.,* 102 *N. J. Super.* 279 (*App. Div.* 1968). Thereafter we granted defendants' petition for certification. 53 *N. J.* 62 (1968).

The trial testimony was not recorded and the matter was submitted to the Appellate Division on an agreed statement of facts. On argument before us, the following facts were likewise undisputed.

The defendants, who by stipulation were to be considered as one, operated a number of beauty parlors where permanent waves were offered to the public for a consideration. For about a year and a half prior to the incident in question, Mrs. Newmark had been a patron of one of defendants' shops where she had a standing appointment every week to have her hair washed and set. She was usually attended by the same operator, one William Valante. During that period plaintiffs' brief asserts and defendants do not deny that she had purchased permanent waves there, at least one having been given by Valante,[2] and she had not experienced any untoward results.

On November 16, 1963, pursuant to an appointment, Mrs. Newmark went to the beauty parlor where she inquired of Valante about a permanent wave that was on special sale. He told her that her fine hair was not right

---

[1] The Appellate Division found no factual basis for the claim of express warranty. The trial evidence furnishes reasonable support for that finding and we accept it as dispositive of that aspect of the case.

[2] See footnote 4, *infra p.* 14.

for the special permanent and that she needed a "good" permanent wave. She agreed to accept the wave suggested by him. Valante conceded that the wave she received was given at his suggestion and that in accepting it she relied on his judgment as to what was good for her hair. Both Valante and Mrs. Newmark testified there was nothing wrong with her hair or scalp before the wave was given.

Valante proceeded to cut and wash her hair after which he put her head under a dryer for about 10 minutes. The hair was then sectioned off, a permanent wave solution marketed under the name "Helene Curtis Candle Wave" was applied with cotton and the hair was rolled section by section. Following this, more of the waving solution was put on by an applicator-bottle. Then a cream was placed along the hairline and covered with cotton. About three to five minutes after the last of the waving solution had been applied Mrs. Newmark experienced a burning sensation on the front part of her head. She complained to Valante who added more cream along the hairline. This gave some relief but after a few minutes she told him that it was burning again. The burning sensation continued but was alleviated when Valante brought her to a basin and rinsed her hair in lukewarm water. The curlers were then removed, a neutralizing solution was applied and allowed to remain for about seven minutes, and her hair was again rinsed. After this Valante set her hair and again put her under the dryer where she remained for about 25 minutes. The burning sensation returned and she promptly informed Valante who reduced the heat of the dryer thereby giving her partial relief. When the dryer operation was completed her hair was combed, and she left the parlor.

That evening her head reddened, and during the following day her entire forehead was red and blistered. A large amount of hair fell out when it was combed. On November 19 she returned to defendants' place of business where Valante gave her, without charge. a conditioning treatment which he told her is given when the hair is dry. Mrs. New-

mark testified that it made her hair feel singed at the hairline.

Six days after the permanent wave Mrs. Newmark consulted a dermatologist who diagnosed her condition as contact dermatitis of the scalp and loss of hair resulting therefrom. On the basis of his experience, he concluded that the sole cause of her condition was the permanent wave solution. The redness and tenderness of the scalp diminished under his treatment. When he last saw her on December 13, 1963 the loss of hair on the top of her head was still present and he could not estimate the time it would take for replacement.

Defendants' dermatologist examined plaintiff over four months after the incident. He noticed several areas of diminution of hair which he attributed to Mrs. Newmark's use of wire brush curlers. The agreed statement of facts does not say expressly that the doctor denied plaintiffs' physician's assertion that the permanent wave solution caused the dermatitis. Since defendants argue that there was insufficient proof of the solution's defectiveness, presumably their contention is that their doctor's attribution of the diminution of hair to Mrs. Newmark's use of wire brush curlers warrants an inference that such curlers were the original producing cause of her dermatitis. Such an inference is rather insubstantial in view of Mrs. Newmark's assertion that she never had any such condition before the solution was applied on the occasion in question, and in the absence of any testimony by Valante or any of defendants' beauticians who gave her waves for a long time before the injurious event, that her use of wire brush hair curlers had caused or would cause damage to her scalp or loss of hair. Moreover, plaintiffs' dermatologist acknowledged that wire brush curlers could cause breakage of hair but expressly denied that they could cause dermatitis.

Valante identified the permanent wave solution as "Candle Glow," a product of Helene Curtis. He said the liquid was mild but could damage a scalp which had scratches on it

or could cause a sting if the solution were rubbed into the scalp. He applied the solution as it came from the original package or container, and his experience had shown that a tingling or burning sensation, the degree varying with different persons, was fairly common. The label on the package contained a caveat for the beauty operator. It said:

"Always wear rubber gloves when giving a wave. Make sure patron's hair and scalp are in condition to receive a cold wave. Never brush or rub the scalp vigorously either before or after shampooing. If the scalp is excessively tender or shows evidence of sores or abrasions, the wave should not be given. Ask the patron her previous experience with cold waves to be sure she does not have a sensitivity to waving lotion."

Mrs. Newmark did not see this label, and there is nothing in the record to indicate Valante asked her about any previous experience with cold waves. It does appear, however, that she had four permanent waves without ill effects after the incident involved here and before trial of this case.

In dismissing the cause of action based on warranty, the trial court expressed the view that the transaction with Mrs. Newmark was not a sale within the contemplation of the Uniform Commercial Code, N. J. S. A. 12A:2–106(1), but rather an agreement for the rendition of services. Therefore, it was not accompanied by any warranty of fitness of products used in rendering the services, and the liability of the beauty parlor was limited to the claim of negligence. Having in mind the nature of a permanent wave operation, we find that the distinction between a sale and the rendition of services is a highly artificial one. If the permanent wave lotion were sold to Mrs. Newmark by defendants for home consumption or application or to enable her to give herself the permanent wave, unquestionably an implied warranty of fitness for that purpose would have been an integral incident of the sale. Basically defendants argue that if, in addition to recommending the use of a lotion or other product and supplying it for use, they applied it, such fact (the application) would have

the effect of lessening their liability to the patron by eliminating warranty and by limiting their responsibility to the issue of negligence. There is no just reason why it should. On the contrary by taking on the administration of the product in addition to recommending and supplying it, they might increase the scope of their liability, if the method of administration were improper (a result not suggested on this appeal because the jury found no negligence).

The transaction, in our judgment, is a hybrid partaking of incidents of a sale and a service. It is really partly the rendering of service, and partly the supplying of goods for a consideration. Accordingly, we agree with the Appellate Division that an implied warranty of fitness of the products used in giving the permanent wave exists with no less force than it would have in the case of a simple sale. *Newmark v. Gimbel's Inc., supra,* at 285–286; *Watson v. Buckley,* 1 *All. E. R.* 174 (*K. B. D.* 1940). Obviously in permanent wave operations the product is taken into consideration in fixing the price of the service. The no-separate-charge argument puts excessive emphasis on form and downgrades the overall substance of the transaction. If the beauty parlor operator bought and applied the permanent wave solution to her own hair and suffered injury thereby, her action in warranty or strict liability in tort (*Santor v. A. & M. Karagheusian, Inc.,* 44 *N. J.* 52, 64–65 (1965)) against the manufacturer-seller of the product clearly would be maintainable because the basic transaction would have arisen from a conventional type of sale It does not accord with logic to deny a similar right to a patron against the beauty parlor operator or the manufacturer when the purchase and sale were made in anticipation of and for the purpose of use of the product on the patron who would be charged for its use. Common sense demands that such patron be deemed a consumer as to both manufacturer and beauty parlor operator.

A beauty parlor operator in soliciting patronage assures the public that he or she possesses adequate knowledge and skill to do the things and to apply the solution necessary to

produce the permanent wave in the hair of the customer. When a patron responds to the solicitation she does so confident that any product used in the shop has come from a reliable origin and can be trusted not to injure her. She places herself in the hands of the operator relying upon his or her expertise both in the selection of the products to be used on her and in the method of using them. The ministrations and the products employed on her are under the control and selection of the operator; the patron is a mere passive recipient.

██ The oft quoted statement that in the modern commercial world the liability of a manufacturer or a retail seller of a product should not be made to depend strictly upon the intricacies of the law of sales is most pertinent here. *Santor v. A. & M. Karagheusian, Inc., supra,* 44 *N. J.,* at 65; *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, 384 (1960). It was not the intention of the framers of the Uniform Commercial Code to limit the birth of implied warranties to transactions which technically meet its definition of a sale. The comment to *N. J. S. A.* 12A:2–313 makes this clear by saying:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of containers under a contract for the sale of their contents. * * *." (*Comment* 2, *p.* 190).

██ This Court has already said there is no sound reason for restricting implied warranties of fitness to conventional sales of goods. *Cintrone v. Hertz Truck Leasing,* 45 *N. J.* 434, 446 (1965); *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965); and see, *N. J. S. A.* 12A:2–314(1) treating as a sale the serving of food for value by a restaurateur for consumption on or off the premises, and subjecting the trans-

action to an implied warranty of fitness; Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 *Colum. L. Rev.* 653, 662–669 (1957). It seems to us that the policy reasons for imposing warranty liability in the case of ordinary sales are equally applicable to a commercial transaction such as that·existing in this case between a beauty parlor operator and a patron. Although the policy reasons which generate the responsibility are essentially the same, practical administration suggests that the principle of liability be expressed in terms of strict liability in tort thus enabling it to be applied in practice unconfined by the narrow conceptualism associated with the technical niceties of sales and implied warranties. (This seems to be the overall import of the Appellate Division statement that the "core" question is whether "warranty principles" permit a recovery in this kind of case.) One, who in the regular course of a business sells or applies a product (in the sense of the sales-service hybrid transaction involved in the present case) which is in such a dangerously defective condition as to cause physical harm to the consumer-patron, is liable for the harm. Consumption in this connection includes all ultimate uses for which the product is intended. 2 *Restatement, Torts 2d,* § 402A, p. 347 (1965) adopts this view. Obviously the ultimate use of the Helene Curtis permanent wave solution intended by both manufacturer and beauty parlor operator was its application to the hair of a patron. And as Comment 1 to the *Restatement* section says, "the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer." 2 *Restatement, supra,* at p. 354.

Defendants claim that to hold them to strict liability would be contrary to *Magrine v. Krasnica,* 94 *N. J. Super.* 228 (*Cty. Ct.* 1967), *aff'd sub nom. Magrine v. Spector,* 100 *N. J. Super.* 223 (*App. Div.* 1968), *aff'd* 53 *N. J.* 259 (1969). We cannot agree. Magrine, a patient of the defendant-dentist, was injured when a hypodermic needle being used, concededly with due care, to administer a local anesthetic broke off in his gum or jaw. The parties agreed that the break re-

sulted from a latent defect in the needle. It was held that the strict liability in tort doctrine was not applicable to the professional man, such as a dentist, because the essence of the relationship with his patient was the furnishing of professional skill and services. We accepted the view that a dentist's bill for services should be considered as representing pay for that alone. The use of instruments, or the administration of medicines or the providing of medicines for the patient's home consumption cannot give the ministrations the cast of a commercial transaction. Accordingly the liability of the dentist in cases involving the ordinary relationship of doctor and patient must be tested by principles of negligence, *i. e.,* lack of due care and not by application of the doctrine of strict liability in tort.

Defendants suggest that there is no doctrinal basis for distinguishing the services rendered by a beauty parlor operator from those rendered by a dentist or a doctor, and that consequently the liability of all three should be tested by the same principles. On the contrary there is a vast difference in the relationships. The beautician is engaged in a commercial enterprise; the dentist and doctor in a profession. The former caters publicly not to a need but to a form of aesthetic convenience or luxury, involving the rendition of non-professional services and the application of products for which a charge is made. The dentist or doctor does not and cannot advertise for patients; the demand for his services stems from a felt necessity of the patient. In response to such a call the doctor, and to a somewhat lesser degree the dentist, exercises his best judgment in diagnosing the patient's ailment or disability, prescribing and sometimes furnishing medicines or other methods of treatment which he believes, and in some measure hopes, will relieve or cure the condition. His performance is not mechanical or routine because each patient requires individual study and formulation of an informed judgment as to the physical or mental disability or condition presented, and the course of treatment needed. Neither medicine nor

dentistry is an exact science; there is no implied warranty of cure or relief. There is no representation of infallibility and such professional men should not be held to such a degree of perfection. There is no guaranty that the diagnosis is correct. Such men are not producers or sellers of property in any reasonably acceptable sense of the term. In a primary sense they furnish services in the form of an opinion of the patient's condition based upon their experienced analysis of the objective and subjective complaints, and in the form of recommended and, at times, personally administered medicines and treatment. Compare, *Gagne v. Bertran,* 43 *Cal.* 2d 481, 275 *P.* 2d 15 (1954). Practitioners of such callings, licensed by the State to practice after years of study and preparation, must be deemed to have a special and essential role in our society, that of studying our physical and mental ills and ways to alleviate or cure them, and that of applying their knowledge, empirical judgment and skill in an effort to diagnose and then to relieve or to cure the ailment of a particular patient. Thus their paramount function — the essence of their function — ought to be regarded as the furnishing of opinions and services. Their unique status and the rendition of these *sui generis* services bear such a necessary and intimate relationship to public health and welfare that their obligation ought to be grounded and expressed in a duty to exercise reasonable competence and care toward their patients. In our judgment, the nature of the services, the utility of and the need for them, involving as they do, the health and even survival of many people, are so important to the general welfare as to outweigh in the poliiy scale any need for the imposition on dentists and doctors of the rules of strict liability in tort.

Defendants also advance the claim that Mrs. Newmark's dermatitis resulted from an allergic reaction to the permanent wave solution. Therefore they contend she should not be allowed to recover because no proof was offered to show that the manufacturer or the retailer knew or should have known that a sufficiently large number of consumers

would suffer an injurious allergic response, and that consequently there was no duty to give warning or notice to the consumer of that possibility before the solution was applied to her hair and scalp.[3]

There is no proof in the record that Mrs. Newmark's condition arose from an allergic reaction to the wave solution. Moreover, no such defense was raised at the trial. If it had been raised the burden of establishing it would have rested upon the defendants. In the absence of proof to the contrary the law assumes that all persons are normal in mind and body and not subject to any idiosyncrasy or abnormal allergic responses to particular stimuli. *Lyndhurst v. United Cork Co.*, 116 *N. J. Eq.* 4, 12 (*Ch. Div.*), aff'd 117 *N. J. Eq.* 437 (*E. & A.* 1934); *Board of Health v. Lederer*, 52 *N. J. Eq.* 675, 677–678 (*Ch. Div.* 1894); *Payne v. R. H. White Co.*, 314 *Mass.* 63, 49 *N. E. 2d* 425, 426 (1943). Moreover, the evidence here showed that Mrs. Newmark had received permanent waves from defendants' beauty parlor without injurious consequences

---

[3] In connection with the claim of allergic response, we note (although it played no part in our determination here) in 3 *Frumer— Friedman, Products Liability*, § 28.12, c. 8, p. 30 (1968), that in 1958 a Dr. Reiss sent a questionnaire to 2969 dermatologists; 956 of them, or about one-third of the skin specialists in the country at that time, replied. This survey showed over 14,000 cosmetic reactions in 1958 to a limited number of cosmetic preparations. It revealed:

"TABLE (A)"

|  | No. of Cases | Percent of Total | No. of Cases per Physician Reporting | |
|---|---|---|---|---|
| Permanent Wave Lotion | 3,764 | 25.2% | 3.9 | |
| Lipstick | 2,137 | 14.4% | 2.2 | |
| Hair Dye | 3,549 | 23.8% | 3.7 | |
| Nail Lacquer | 5,447 | 36.6% | 5.7 | |
| Total | 14,897 | 100% | 15.5 | |

Dr. Charles W. Whitmore, a dermatologist whose qualifications appear on page 2 of Chapter 8, contributed Chapter 8 to the Frumer — Friedman work. Commenting on Table (A) he said the actual number of cases must have numbered between 15 and 50 thousand considering that a number sought medical advice from non-specialists, or no medical advice at all. *Id.* at p. 29.

both before and after the incident in question.[4] As noted above, the label on the wave solution container instructed the operator to "ask the patron her previous experience with cold waves to be sure she does not have a sensitivity to waving lotion." Valante, who had taken care of Mrs. Newmark's hair on previous occasions obviously did not make the inquiry. A justifiable inference is that he knew that she did not have the sensitivity which conserned the manufacturer. And he testified that, when the treatment in question began, his examination revealed nothing abnormal about her hair or scalp. Neither of the two dermatologists who testified even intimated that the injurious consequences arose because of some allergy or idiosyncrasy to which she was subject. After a consideration of the history, plaintiffs' dermatologist attributed her condition to the waving solution, while defendants' dermatologist indicated that it might have come from the type of hair curlers she used. Under the circumstances, we find no factual or legal merit in the defense that Mrs. Newmark's dermatitis came from an allergic reaction.[5]

---

[4] As has been noted, defendants did not raise the allergy issue at the trial. Consequently when the agreed statement of facts was prepared, the fact that Mrs. Newmark had received permanent waves from defendants' beauty parlor (without injurious consequences) before the accident in question was not included. However, when the allergy problem was referred to in the Appellate Division, plaintiffs asserted in their brief that this fact had been introduced at the trial. Defendants did not dispute the assertion in their brief.

[5] In presenting the defense that plaintiff suffered an uncommon allergic reaction to the wave solution which neither the manufacturer nor the beauty parlor operator should be required to warrant against, defendants ask us to reconsider and to overrule the long-standing cases of *Zirpola v. Adam Hat Stores, Inc.*, 122 N. J. L. 21 (*E. & A.* 1939) and *Reynolds v. Sun Ray Drug Co.*, 135 N. J. L. 475 (*E. & A.* 1947). These cases hold that an implied warranty of fitness of an article for the purpose for which it is sold binds the seller even though only a small proportion of those who use such an article are injuriously affected thereby. In view of our disposition of the defendants' allergy claim, there is no need to reexamine *Zirpola* and *Reynolds*, much less to depart from the principle they espouse.

In arguing against strict liability in tort or liability under the Uniform Commercial Code for breach of implied warranty, defendants point out further that the permanent wave solution is bought from the manufacturer and applied to their patrons from the original package. Thus they say they have no greater opportunity to discover any injurious or defective quality than does the patron. But they occupy the status of retailers, and lack of opportunity to inspect the goods they supply to the publicly solicited customer does not relieve them of liability. 2 *Restatement, Torts 2d, supra,* § 402*A, comment f, p.* 350. It has long been settled that retailers and those whose relationship with their patrons or consumers place them in that classification, are subject to a heavy burden of liability. The liability has been predicated upon breach of implied warranty of fitness or more recently in terms of strict liability in tort. *Henningsen v. Bloomfield Motors, Inc., supra,* 32 *N. J.,* at 406; *Higbee v. Giant Food Shopping Center, Inc.,* 106 *F. Supp.* 586 (*D. C. Va.* 1952); *Vandermark v. Ford Motor Company,* 61 *Cal. 2d* 256, 37 *Cal. Rptr.* 896, 391 *P. 2d* 168, 171–172 (1964); *Graham v. Botlenfield's, Inc.,* 176 *Kan.* 68, 269 *P. 2d* 413 (1954); *McKisson v. Sales Affiliates, Inc.,* 416 *S. W. 2d* 787 (*Tex. Sup.* 1967); 2 *Restatement, supra, comment f, p.* 350; *Harper & Jones, Torts,* § 28.30, *p.* 1600 (1956). As Chief Justice Traynor noted in *Vandermark, supra,* retailers are engaged in the distribution of goods to the public. They select the manufacturer whose products they wish to sell, and thus they become part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. Moreover, from a practical standpoint the strict liability of the dealer may move him to put pressure on the manufacturer to make the products safe.

Strict liability to the injured consumer does not leave the dealer without remedy. He has an action over against the manufacturer who should bear the primary responsibility for putting defective products in the stream of trade. Considering the overall problem of prosecuting products lia-

bility cases, it would seem to make sense procedurally to have the plaintiff's cause of action whenever possible adjudicated in one action against manufacturer and retailer. If the plaintiff sues the dealer alone, the dealer in his own interest should implead the manufacturer and thus avoid circuity of action. Service of process on the manufacturer may present a problem occasionally. But here recourse may be had to the long-arm service rule, *R*. 4:4–4(*c*)(1),(*e*), with its obvious implications of liberal application. Its use may overcome the difficulty in most cases.

Accordingly, in light of all of the above, and particularly the testimony of the plaintiffs' dermatologist attributing the hair and scalp injury to the permanent wave solution, in our judgment a factual issue was presented at trial for jury determination as to (1) whether the permanent wave solution was defective, and (2) whether it was the proximate cause of the dermatitis. An affirmative answer by the jury would warrant a verdict for the plaintiffs.

The judgment of the Appellate Division is affirmed for the reasons stated, and the cause is remanded for a new trial.

*For affirmance*—Chief Jutice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.