**Linda WIRTH, Individually and as a Personal Representative of the Estate of Larry Wirth, Deceased, Plaintiff and Appellant,**

v.

**MAYRATH INDUSTRIES, INC., Defendant,**

and

**Cavalier Rural Electric Cooperative, Inc., Defendant and Appellee.**

**Civ. No. 9580.**

Supreme Court of North Dakota.

May 9, 1979.

O'Grady & Morley, Grand Forks, and Cameron D. Sillers, Langdon, for plaintiff and appellant; appearance by Cameron D. Sillers, Langdon; argued by Lowell A. O'Grady, Grand Forks.

Vaaler, Gillig, Warcup, Woutat & Zimney, Grand Forks, for defendant Mayrath Industries; no appearance.

Dahl & Greenagel, Grafton, for defendant and appellee Cavalier Rural Electric Cooperative, Inc.; argued by Robert E. Dahl, Grafton.

ERICKSTAD, Chief Justice.

The plaintiff, Linda Wirth, individually and as the personal representative of the estate of Larry Wirth, deceased, appeals to our court from the order of the district court, dated October 20, 1978, which struck Count V alleging strict liability from the complaint.[1] We affirm.

---

1. "IT IS HEREBY ORDERED That all of Count V (Strict Liability) of the plaintiff's complaint be and it is hereby dismissed and stricken from the complaint on the ground that strict liability

Linda's statement of the case follows:

"1. Appellant Linda Wirth (Wirth), for herself and two minor children, commenced a wrongful death action for the death of her husband, Larry Wirth, age 25, who was electrocuted on August 23, 1977. The action was brought against Defendants Cavalier Rural Electric Cooperative, Inc., (R.E.C.), and Mayrath Industries, Inc., (Mayrath), wherein Linda Wirth alleged negligence and strict liability in tort under §§ 402A and 519 of the Restatement of Torts 2d, against R.E.C., and breach of implied warranty, negligence in design and maintenance of the lines, and strict liability in tort under § 402A of the Restatement of Torts 2d, against Mayrath. She served extensive Interrogatories on each Defendant at the same time the Complaint was served.

"2. The electrocution occurred on the Norman and Nora Wirth (elder Wirths') farmstead. The farmstead is located southwest of Munich, North Dakota on a rectangularly shaped tract of several acres of land with its greatest length to the north and south. The farm buildings were served electrical power by R.E.C.'s high tension lines coming from the east but terminating at the elder Wirths' farm buildings. R.E.C. owned and maintained a separate high tension line located farther north that crossed the north one-third of the farmstead by easement from a former owner of the land, and several hundred feet to the north of the other line. The second line (north line) provided electrical service to the farm neighbors of the elder Wirths to the west, but not to the elder Wirths' farmstead.

"3. Over the years the elder Wirths had built a row of four steel grain bins from south to north and on the south two-thirds of the farmstead. The last of the four bins (fourth bin) had been built in 1969 and its closest point was less than sixteen feet (16') to the south of R.E.C.'s north line. In line with the four bins farther to the west and separated by

about fifty feet (50') were two steel drier bins.

"4. During the spring of 1977 the elder Wirths increased the grain storage in the four bins by adding a steel ring to each of the four bins. This increased each bins's height several feet.

"5. In the forenoon of August 23, 1977, Larry Wirth and his father, Norman Wirth, were manually moving a forty-one foot (41') Mayrath grain auger in an elevated position from the fourth bin to the drier bin to the west of the fourth bin. To position the auger they were crossing R.E.C.'s north lines when the top portion of the auger contacted the phase wire of the two wire line configuration and Larry Wirth was instantly electrocuted and Norman Wirth suffered severe electrical burns requiring immediate hospitalization.

"6. R.E.C. did not answer the Complaint and moved by motion under 12(b)(5) to dismiss Wirth's allegation of strict liability based upon § 402A of the Restatement of Torts 2d. Mayrath interposed answer denying all liability and served extensive Interrogatories upon Wirth. Before resisting Mayrath's [R.E.C.'s] motion and while resisting a motion for a change of venue by R.E.C., Wirth's attorney verbally notified R.E.C. and the trial Court she intended to amend her Complaint and allege that at the time of electrocution R.E.C. was conducting an abnormally dangerous business activity in the maintenance of its north line across the elder Wirths' farmstead. The Court indicated it was not necessary to amend the Complaint but Wirth could submit all the facts she had outside the pleadings and what law she could muster in briefs, including all Answers to Interrogatories, and the Court would rule on R.E.C.'s motion and also rule on whether Wirth could amend and include a 519 allegation against R.E.C.

does not apply to actions for injuries and damages from contact with high tension power lines owned and operated by utilities such as the defendant REC and that this conclusion

obtains whether the asserted cause of action is based upon either Section 402 (A) or Section 519 of the *Restatement of Torts 2d.*;"

"7. The case comes before this Court for review of the trial Court's partial summary judgment in favor of R.E.C. striking Wirth's allegation of strict liability under § 402A from her Complaint and refusing her leave to amend and include an allegation against R.E.C. under § 519 of Restatement of Torts 2d."

Part 7 of Linda's statement of the case is clarified by the trial court's memo:

"The Motion:

"By defendant Cavalier R.E.C. to strike Count V of plaintiff's complaint which charges this defendant with strict liability for ownership and maintenance of electrically charged power lines.

"Court's Ruling:

"Strict liability does not apply to actions for injuries and damages from contact with high tension power lines owned and operated by utilities such as the defendant R.E.C. in this case. This conclusion obtains whether the asserted cause of action is based upon either Section 402(A) or Section 519 of the *Restatement of Torts, 2d. Williams v. Detroit Edison Co.,* 234 N.W.2d 702 (63 Mich.App. 559, 1975); *Brigham v. Moon Lake Electric Ass'n,* 470 P.2d 393 (24 Utah 2d 292, 1970); *Kemp v. Wisconsin Electric Power Co.,* 172 N.W.2d 161 (44 Wis.2d 571, 1970).

See, *Ferguson v. Northern States Power Co.,* 239 N.W.2d 190 (307 Minn. 26, 1976).

"Motion granted, with motion costs awarded to movant."

Linda relies on Sections 402A, 519, and 520 of the Restatement of Torts 2d [2] for her argument that the concept of strict liability applies to R.E.C. in this action.

In discussing the cases relied upon by the trial court, counsel for Linda asserts that only *Kemp* and *Williams* discuss the liability of the defendant under Section 402(a). He states that both cases concluded that since the electricity in question had not passed through a customer's meter, there could be no recovery under Section 402(a), and he asserts that the cases overlook that before there can be a sale to the customer, the utility must provide the means or service to the customer's meter. He contends that the situation is analogous to hospital blood cases and refers us to the case of *Johnson v. Sears, Roebuck & Co.,* 355 F.Supp. 1065, 1066–67 (E.D.Wis.1973):

"Courts in New Jersey, Pennsylvania, and Michigan have also found the sales/service dichotomy untenable. In *Newmark v. Gimbel's Incorporated,* 54 N.J. 585, 258 A.2d 697 (1969), the New Jersey Supreme Court held a beauty op-

2. "§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user of consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." Restatement of Torts 2d, § 402A.

"§ 519. General Principle.

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another

resulting from the activity, although he has exercised the utmost care to prevent the harm.

"(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement of Torts 2d, § 519.

"§ 520. Abnormally Dangerous Activities

"In determining whether an activity is abnormally dangerous, the following factors are to be considered:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

"(b) likelihood that the harm that results from it will be great;

"(c) inability to eliminate the risk by the exercise of reasonable care;

"(d) extent to which the activity is not a matter of common usage;

"(e) inappropriateness of the activity to the place where it is carried on; and

"(f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement of Torts 2d, § 520.

erator strictly liable for injuries caused by a permanent wave application stating 'the distinction between a sale and the rendition of services is a highly artificial one.' 258 A.2d at 700. In *Hoffman v. Misericordia Hospital of Philadelphia*, 439 Pa. 501, 267 A.2d 867 (1970), the complaint charged that the plaintiff's deceased had contracted serum hepatitis and died after receiving a transfusion while a patient at Misericordia. The trial court granted defendant's demurrer because the transaction was not a 'sale.' The Supreme Court of Pennsylvania reversed because it did 'not feel obligated to hinge any resolution of the very important issue here raised on the technical existence of a sale.' 267 A.2d at 870. The court stated further that the demurrer was improperly sustained 'without sufficient inquiry as to whether the policies for which warranties are implied in law would be furthered by their implication in this situation.' 267 A.2d at 871. Finally, the Michigan Court of Appeals held in *Buckeye Union Fire Insurance Co. v. Detroit Edison Co.*, 38 Mich.App. 325, 196 N.W.2d 316, 317 (1972), that 'implied warranties * * * should apply to the sale of services as well as to the sale of goods.' " 355 F.Supp. at 1066.

Counsel further quotes from *Johnson* in support of his contention that strict liability should apply in this case for the same reasons that the court urged it should apply in hospital service cases.

"I do not, however, feel that the mechanical and administrative services provided by hospitals should necessarily be exempt from strict liability. Several considerations lead me to this conclusion. They are: first, the serious consequences which can result when a patient receives defective hospital services; second, the near total inability of laymen to recognize or control such defective service;" 355 F.Supp. at 1067.

*Johnson* is distinguishable from the present case inasmuch as there has been no showing of a defective service in the instant case.

Counsel for Linda asserts that the standard charge for burying line underground is $200, that this is the charge that was made subsequent to the incident which resulted in Larry Wirth's death in this case and inferentially, that because of this small cost the line should have been initially buried by the cooperative, and that as the line was not buried and the death occurred, the rural electric cooperative should bear the economic cost of the death because it can spread the loss among its 1800 members. Counsel asserts that this is a rational approach which should be applied in cases such as this.

What counsel is asking us to do is to legislate. He refers us to a recent decision of the Minnesota Supreme Court entitled *Ferguson v. Northern States Power Co.*, 307 Minn. 26, 239 N.W.2d 190 (1976), asserting that the court came within an eyelash of holding the power company strictly liable.

■ The crucial point, however, is that the Minnesota Supreme Court did not hold the company strictly liable. We quote therefrom:

"We consider the risk so unusual that we requested further argument, both from the parties and amici curiae, on whether the maintenance of an uninsulated high-voltage transmission line constitutes an 'abnormally dangerous activity,' thereby subjecting the owner of the line to strict liability for harm caused another as a result of coming in contact with the line. [Footnote omitted.] When the proposed Restatement sections quoted in footnote 2 below [§§ 519, 520] are applied to the circumstances of this case, a convincing argument can be made for holding the utility strictly liable. Moreover, spreading the cost of serious injury over all consumers of electricity is equitably more appealing. *However, the court is persuaded by the amicus briefs which detail the severe economic consequences which*

*may be sustained by the many small electric utilities in the state by the abrupt imposition of such a rule. We therefore decline to decide this issue at this time; however, we do call this matter to the attention of the legislature which is better equipped to resolve economic problems of this nature."* [Emphasis added.] 239 N.W.2d at 193–94.

We, too, think this is a matter appropriate only for legislative consideration.

■ Returning now to a discussion of Section 519 of the Restatement, counsel for Linda asserts that *Ferguson, Williams, Kemp,* and *Brigham* all discuss liability under Section 519, but that they are clearly distinguishable from the instant case. It should be noted that they are all power line cases in which Section 519 was found to be inapplicable.

We have reviewed the six alleged bases for distinguishing the cases in light of the facts in *Ferguson, Williams, Kemp* and *Brigham*, and conclude that the distinguishing features if relevant at all, relate to the issue of negligence and thus may be considered under the other counts of the complaint.

Counsel for Linda places great reliance upon *Chavez v. Southern Pacific Transp. Co.,* 413 F.Supp. 1203 (E.D.Cal.1976), pages 1207 and 1208 as follows:

> "The notion that one engaged in unusual activity should be held strictly liable for resulting damages was popularized by the English case of *Rylands v. Fletcher,* 3 H. & C. 774 (1865), reversed L.R. 1 Ex. 265 (1866), affirmed L.R. 3 H.L. 330 (1868). The rule of that case, as it has developed from subsequent English cases, has been succinctly stated by the late Professor Prosser to be:
>
> > '(T)hat the defendant will be liable when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings.' W.

Prosser, Law of Torts 508 § 78 (4th ed. 1971).

\*   \*   \*   \*   \*   \*

"This 'fairness' rationale for imposing strict liability for the miscarriage of an ultrahazardous activity has been undergoing a metamorphosis. In the last Supreme Court of California decision involving this theory of liability, the court held a fumigator, licensed to use hydrocyanic acid to kill pests, strictly liable for personal injuries suffered when the lethal fumes seeped through the cracks of a building and found a victim. *Luthringer v. Moore, supra.* (31 Cal.2d 489, 190 P.2d 1) Although the court quoted at length from the Restatement of Torts (§§ 519, 520, 521, 523, and 524), it reached its decision in reliance on the case of *Green v. General Petroleum Corp., supra.* (205 Cal. 328, 270 P. 952) Further while the court relied on the *Green* case, it justified the result by reference to an unspecified public policy:

> '(T)here can be no doubt that the case of *Green v. General Petroleum Corp., supra,* enunciated a principle of absolute liability which is applicable to the instant case. It is not significant that a property damage, as distinguished from a personal injury, was there involved. *The important factor is that certain activities under certain conditions may be so hazardous to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy.'* 31 Cal.2d at 500, 190 P.2d at 8." [Emphasis added by this court.] 413 F.Supp. at 1207–08.

The facts in the instant case are clearly distinguishable from the facts in *Chavez.* In the instant case, the alleged ultrahazardous activity is a power line constructed on land pursuant to an easement granted by the predecessor in interest of the present owner, the father of the decedent, which produced no injury until it was brought into contact with the grain auger which was

being guided by the decedent and his father. This is to be compared with the facts in *Chavez* in which approximately 18 bomb loaded boxcars exploded in the railway transportation company's yard.

The cases referred to in *Chavez* were *Rylands v. Fletcher*, 3 H. & C. 774 (1865), reversed L.R. 1 Ex. 265 (1866), affirmed L.R. 3 H.L. 330 (1868), involving liability for injuries resulting from improper maintenance of a reservoir on defendant's land; *Colton v. Onderdonk*, 69 Cal. 155, 10 P. 395 (1886), involving liability for damages from explosion by one engaged in blasting; *Munro v. Pacific Coast Dredging and Reclamation Co.*, 84 Cal. 515, 24 P. 303 (1890), involving liability for injuries from explosions by one engaged in blasting; *Green v. General Petroleum Corp.*, 205 Cal. 328, 270 P. 952 (1928), involving liability for damages resulting from an oil well "blow-out" by one engaged in oil drilling in a residential area; and *Luthringer v. Moore*, 31 Cal.2d 489, 190 P.2d 1 (1948), involving liability for personal injuries from seepage of fumes by one who was licensed to use hydrocyanic acid to kill pests. These cases are readily distinguishable on their facts.

Counsel for Linda asserts that our decision in *Kirton v. Williams Electric Co-op., Inc.*, 265 N.W.2d 702 (N.D.1978) requires that we conclude in this case that the trial court was in error in granting the judgment appealed from.

In *Kirton*, we reversed a summary judgment of the trial court, not for the reasons asserted here, but for the reason that we believed there were material issues of fact to be tried and that therefore the case was inappropriate for summary judgment disposition. Our reference to the nuisance issue was merely to state as that issue had not been adequately argued in our court that we would not decide that issue at that time.[3]

Counsel for the cooperative asserts that he believes that the key word in the application of Section 519 is the word "abnormally". He quotes from comment *f* under Section 520 as follows:

> "for an activity to be abnormally dangerous, not only must it create a danger of physical harm to others but the danger must be an abnormal one. *In general, abnormal dangers arise from activities that are in themselves unusual, or from unusual risks created by more usual activities under particular circumstances.*" [Emphasis added by counsel.]

In support of his contention, he asserts that cities in the United States have had electrical power available to them for a century, more or less, and that rural areas in this country have had electrical power available to them since the end of World War II. He stresses the necessity of electrical power to our society.

We agree that electrical power is necessary to the well-being of our country and our state, and believe that it is becoming more important as other sources of energy become scarce.

We conclude that the provisions of Section 519 and 520 of the Restatement of Torts 2d are inapplicable to this case.

---

3. "The second issue before us is whether or not the district court properly granted the summary judgment motion dismissing the nuisance ground of Kirton's complaint.

"The court, in its order granting defendant summary judgment, said:

'. . . the maintenance of the electric power transmission line by the defendant at the point and place where the alleged injury took place did not constitute a private or public nuisance . . . .'

"At oral argument before this court, neither party discussed the nuisance ground. In their briefs, neither party, except for encyclopedia references, cited any authority holding that the maintenance of an electrical transmission line was or was not a nuisance. Instead, the briefs consisted basically of references to the code and generally to the law of nuisance.

"We believe that under these circumstances, and especially in light of the factual disputes and differing inferences which may be drawn from the undisputed facts previously discussed which may affect the question of the existence of a nuisance, it would be premature for us to rule as a matter of law that a nuisance did or did not exist in this case." *Kirton v. Williams Elec. Co-op., Inc., supra*, 265 N.W.2d at 707–08.

Having concluded as we have, we find it unnecessary to discuss in this opinion the issue raised by the cooperative, where it disagrees with Linda's characterization of the motion to dismiss count V of the complaint and the order of the court dismissing count V as a motion and order for "partial summary judgment". It is the position of the cooperative on this issue that the statement of the case should contain no facts that were not in the pleadings at the time Rule 12(b)(5), N.D.R.Civ.P., motion was made. Without so limiting our consideration, we have concluded that the order of the trial court should be affirmed.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.