**PETROLEO BRASILEIRO, S.A., PETROBRAS, Plaintiff,**

v.

**NALCO CHEMICAL COMPANY, Defendant.**

**Civ. A. No. 90–1092.**

United States District Court, D. New Jersey.

Feb. 10, 1992.

---

Peter D. Aufrichtig, Aufrichtig Stein & Aufrichtig, P.C., New York City, for plaintiff.

Dennis LaFiura, Pitney, Hardin, Kipp & Szuch, Florham Park, N.J., for defendant.

## OPINION

BROTMAN, District Judge:

Presently before the court is defendant Nalco Chemical Company's motion for summary judgment or, in the alternative, partial summary judgment dismissing any claim for market loss damages. After considering the submissions of the parties and the arguments of counsel, the court will grant defendant's motion for summary judgment.

## I. FACTS AND PROCEDURE

On December 18, 1989, Internor Trade, Inc. ("Internor") purchased a cargo of approximately 334,000 barrels of high pour, no. 6 fuel oil ("the cargo") which was to be transported by the vessel M/T Mantinia from Bahia, Brazil to Stapleton Anchorage, New York Harbor for sale to Clarendon Marketing, Inc. ("Clarendon"). A survey of the cargo at loadport indicated that the cargo had a basic sediment and water content of 1.1%. The Mantinia arrived at New York Harbor on December 28, 1989. A survey of the cargo in New York Harbor indicated that the cargo had a basic sediment and water content of 4.0% to 4.5%. Clarendon rejected the cargo because its water content exceeded contract specifications. On or about December 31, 1989, Internor arranged to have 173,000 barrels of cargo having the highest basic sediment and water content stored in a tank leased from Clarendon at IMTT–Bayonne.

In January 1990, Internor sought bids to de-water the cargo from several tankage dehydration companies. One of the bidders was the defendant Nalco Chemical Company ("Nalco") which manufactures and markets demulsifiers to de-water petroleum hydrocarbons. Internor had dealt with Nalco twice before. The initial contact was for the treatment of a small quantity of high water content fuel. Internor did not seek a guarantee and the treatment turned out to be unsuccessful. The second experience involved Nalco's proposal to treat No. 6 fuel oil from Bahia, Brazil stored at IMTT–Bayonne. Nalco refused to give a guarantee and its proposal was refused in favor of treatment by S & D Oil Technics ("S & D") which provided a guarantee. For the transaction at issue in this litigation, S & D also submitted a written proposal to Internor on January 5, 1990. Its proposal included supplies and treatment supervision, "100% guaranteed results" at a price of $143,000.00.

Internor's contact with Nalco was initiated by Internor's Operations Manager, William Okerlund who spoke with Walter Wasylak, a Nalco Technical Representative sometime between December 30, 1989 and January 2, 1990. After Wasylak communicated his recommendation for a product, dosage and temperature to Okerlund, Okerlund asked Wasylak whether Nalco would guarantee the results of its treatment. Wasylak told Nalco that as a matter of company policy, Nalco did not give guarantees nor could he personally guarantee results but that it was his opinion that its treatment would be successful. On January 4, 1990, Wasylak reported the results of his analysis of the cargo to Okerlund in a written proposal and offered to provide Nalco 5547 Emulsion Breaker to Internor at a price of $1.61 per pound plus technical assistance during the treatment. The written proposal stated "further testing of the samples with various emulsion breaking chemicals indicated that Nalco 5547 emulsion breaker can reduce the water content of the fuel oil to 0.5%." The total price of Nalco's treatment program was $24,673.25, increased to $30,164.15 when the quantity of cargo to be treated was increased by approximately 59,000 barrels.

Based on the written proposals he had before him from Nalco and S & D, Mauricio Ferreira, Internor Deputy General Manager and Petroleum Department Manager, chose Nalco. Ferreira contends that his decision was based on "Nalco's lower price, its ability to start more quickly (S & D would have to ship its product from Eu-

rope" while the Nalco material was in New Jersey, the site of the cargo), "prior dealings with S & D and Nalco's guarantee as found in its written offer.... [His] review of the offer found a clear representation and warranty of successful results which [Internor] had required."

On or about January 11, 1990, Nalco 5547 was injected into the tank at IMTT–Bayonne containing the cargo. Soon after the treatment, Internor tested some samples of the cargo and determined that the water content had not dropped significantly. Internor considered Nalco's treatment to have been unsuccessful. Rogerio Manso da Cost Reis ("Manso"), Internor's Manager of Physical Products, dealt with Nalco previously and was on vacation at the time of this transaction. When he returned in late January 1990, Manso questioned his Operations Department as to why Nalco was retained since he was aware that they previously refused to give any sort of guarantee. He was told that, in this case, Nalco did not give any kind of written guarantee but verbally mentioned a "round figure, kind of guarantee" that its product and treatment would work.

Internor was liquidated as a result of political events in Brazil sometime in 1990. During the process of its liquidation, Internor assigned its right, title and interest in the claims asserted against Nalco in this action to Petroleo Brasileiro, S.A. Petrobras ("Petrobras"), the Brazilian national oil company and the plaintiff in this action.

## II. DISCUSSION

■ The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. Meyer v. Riegel Prods.

Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. denied, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring) (citing Anderson, 477 U.S. 242, 106 S.Ct. 2505, and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Anderson, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### A. Uniform Commercial Code or General Contract Law?

■ In its motion for summary judgment, Nalco contends that its transaction with Internor is a mixed goods and services contract in which the predominant feature of the contract is the sale of goods. It contends that the sale of chemicals was the predominant feature of the contract and the Uniform Commercial Code ("UCC") as adopted in New Jersey applies. N.J.S.A. 12A:1–101 et seq. Petrobras contends that the contract was predominantly a service

contract for the treatment of oil and that general contract law of the state of New Jersey applies.

The New Jersey Supreme Court has addressed the issue of whether UCC warranty principles apply to mixed goods and services contracts. *Newmark v. Gimbel's, Inc.*, 54 N.J. 585, 258 A.2d 697 (1969). It held that a mixed goods and services contracts involving a transaction between a beauty parlor operator and a patron to be governed by UCC general warranty principles. *Id.* (injury to patron's hair resulting from product used to apply a permanent wave):

> The transaction, in our judgment, is a hybrid partaking of incidents of a sale and a service. It is really partly the rendering of service, partly the supplying of goods for a consideration.... It was not the intention of the framers of the [UCC] to limit the birth of implied warranties to transactions which technically meet its definition of a sale.... It seems to us that the policy reasons for imposing warranty liability in the case of ordinary sales are equally applicable to a commercial transaction such as that existing in this case....

*Id.* at 593–595, 258 A.2d 697.

Because of the New Jersey Supreme Court's decision, it is irrelevant whether the hybrid transaction at issue is predominantly one for goods or one for services. No factual issue is presented which affects Nalco's right to summary judgment since either way, New Jersey courts apply UCC warranty principles.

### B. Express Warranty

Petrobras contends that Nalco expressly warranted that its 5547 emulsion breaker would reduce the water content of the cargo. It maintains that Nalco's January 4, 1990 written proposal contained affirmations of fact that were relied upon by Ferreira in choosing Nalco and formed a basis of the bargain. Moreover, Petrobras contends that the parol evidence rule bars admission of Okerlund's and Manso's testimony indicating that Nalco was unwilling to provide a guarantee of its product's re-

sults. Nalco argues that no express warranty ever came into existence.

Section 12A:2–313 of the New Jersey Statutes Annotated states in relevant part:

> 1) Express warranties by the seller are created as follows:
> a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise....
> 2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Section 12A:2–316(1) provides:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed whenever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (12A:2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

In interpreting Section 12A:2–316, New Jersey Study Comment 1 states:

> [where] the 'disclaimer' is specific and voiced not in a form or in unexpected or unbargained for language, it should control, for in such a case no express warranty has been disclaimed, but rather, the 'disclaimer'—a basic dickered term—has shed light on the entire contract that a reasonable construction of it is that the seller has made no express warranty.

An exclusion of express warranties is inoperative to the extent its terms are unreasonably inconsistent with the express warranties that are given. *Gladden v. Cadillac Motor Car Division*, 83 N.J. 320, 330, 416 A.2d 394 (1980); *Realmuto v. Straub*

*Motors, Inc.,* 65 N.J. 336, 341 n. 2, 322 A.2d 440 (1974).

The court holds that the deposition testimony of two of Internor's employees at the time of the transaction, Okerlund and Manso, clearly indicates that Nalco had no intention of guaranteeing its 5547 emulsion breaker product. Okerlund testified that in his conversation with Wasylak, he was told that no guarantee would be provided. After returning from his vacation, Manso was surprised that Internor had accepted Nalco's proposal since in the past, Nalco was unwilling to guarantee its product which had proved unsuccessful.

In its January 4, 1990 written proposal, Nalco stated that its "5547 emulsion breaker can reduce the water content of the fuel oil to 0.5%." Perhaps, if Okerlund was not so explicit in maintaining that neither Nalco nor he personally could guarantee the effectiveness of its product, an express warranty would have been created by this language guaranteeing the results of the emulsion breaker. Since this is not the case, and since Okerlund was explicit in maintaining that no guarantee would be forthcoming, Petrobras cannot claim the benefits of an express warranty. The court's conclusion is not affected by the fact that Wasylak may have told Okerlund that he believed that the product would be successful since a "statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.J.S.A. 12A:2–313(2).

▇ It is still to be determined whether the parol evidence rule bars the testimony of Okerlund and Manso. Section 12A:2–202 of the New Jersey Statutes Annotated states in relevant part:

Terms … which are … set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

a) by course of dealing or usage of trade (12A:1–205) or by course of performance (12A:2–208). . . .

Even if a writing, in this case Nalco's January 4, 1990 written proposal, is considered to be the complete and exclusive statement of the terms of the agreement, it can be explained by course of dealing, usage of trade or course of performance. *B.F. Hirsch v. Enright Refining Co.,* 577 F.Supp. 339, 345 (D.N.J.1983); *Kearny & Trecker v. Master Engraving Co.,* 211 N.J.Super. 376, 381–382, 511 A.2d 1227 (App.Div.1986). UCC Comment 2 to Section 12A:2–202 states:

Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used.

The term course of dealing is defined in Section 12A:1–205 of the New Jersey Statutes Annotated. Section 12A:1–205 states that:

[a] course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

Here, the testimony of Okerlund and Manso is not barred by the parol evidence rule since it explains the meaning of Nalco's January 4, 1990 written proposal. Manso's previous dealings with Nalco clearly indicate that Nalco did not guarantee the effectiveness of its 5547 emulsion breaker. Moreover, Okerlund's dealings with Wasylak also indicates that Nalco had no intention of changing its policy of not guaranteeing its emulsion breaker. On its face and without reference to course of dealing and course of performance, it is unclear whether or not Nalco's written proposal is intended to guarantee the results. Unlike, S & D's proposal, it does not war-

rant "100% guaranteed results." Okerlund's and Manso's testimony sheds light on whether a guarantee existed and since it relates to Internor's previous dealings with Nalco, it is not barred by the parol evidence rule.

 The court finds that Ferreira's certification that he believed that Nalco clearly represented in its January 4, 1990 written proposal that it was guaranteeing successful results as non-probative of the issue of whether or not a warranty existed. "Under New Jersey contract law, courts look to the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction." *Dome Petroleum Limited v. Employers Mutual Liability Insurance Co.*, 767 F.2d 43, 47 (3rd Cir.1985). It is the intent as expressed or apparent in the writing that controls. *J.I. Hass Co., Inc. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3rd Cir.1989). "Contract construction is directed at discovering the object of intent of the parties manifested in the terms of the agreement, not the undisclosed, subjective intent of one party or another." *Dome* at 47; *Air Master Sales Co. v. Northbridge Park Co-op, Inc.*, 748 F.Supp. 1110, 1115 (D.N.J.1990); *Jacobs v. Great Pacific Century Corp.*, 104 N.J. 580, 587, 518 A.2d 223 (1986). It does not matter what Ferreira thought Nalco intended the contract to mean especially since he was not a party to the negotiations. Nor does it matter that Ferreira relied on what he thought was a guarantee. *Cipollone v. Liggett Group, Inc.* 693 F.Supp. 208, 213 (D.N.J.1988). The court is to look to those involved in the bargaining process, here, Okerlund and Wasylak, and Manso from previous dealings, to determine the meaning of the written proposal.

For the foregoing reasons, the court holds that there are no genuine issues of material fact as to whether an express warranty existed. Because Nalco clearly expressed that no guarantee was to be given, as a matter of law, no such express warranty ever came into existence.

## C. Implied Warranty

 Petrobras contends that this transaction included an implied warranty of fitness for a particular purpose. Nalco argues that it disclaimed this implied warranty.

Section 12A:2–315 of the New Jersey Statutes Annotated states that:

[where] the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Section 12A:2–316(3)(c) states that an implied warranty can be excluded "by course of dealing or course of performance or usage of trade." *See e.g. Country Clubs, Inc. v. Allis–Chalmers Manufacturing Co.*, 430 F.2d 1394, 1397 (6th Cir.1970) (course of dealing and course of performance sufficient to exclude implied warranties because the parties had discussed and negotiated the warranty provisions).

 The court's analysis of the alleged implied warranty of fitness for a particular purpose mirrors its analysis of the alleged express warranty. Since the court is to look to course of dealing or course of performance to see if an implied warranty has been disclaimed, again Okerlund's and Manso's testimony clearly indicates that Nalco did not intend to guarantee that its 5547 emulsion breaker would lower the water content of the cargo. Petrobras has introduced no evidence permitting a jury to find that the implied warranty of fitness for a particular purpose was not disclaimed.

## III. Conclusion

For the foregoing reasons, Nalco's motion for summary judgment will be granted.