**TRUMP TAJ MAHAL ASSOCIATES, a Limited Partnership, Trump Castle Associates, Trump Plaza Associates, and Helicopter Air Services, Inc., Plaintiffs,**

v.

**COSTRUZIONI AERONAUTICHE GIOVANNI AGUSTA, S.p.A., Agusta S.p.A., Gruppo Agusta, Agusta Aviation Corporation, a/k/a Agusta Aerospace, and Paramount Aviation, Inc., Defendants.**

**Civ. A. No. 90–3245(JFG).**

United States District Court,
D. New Jersey.

April 11, 1991.

---

Wolk, Genter & Harrington, by Arthur Alan Wolk, James D. Golkow, Catherine B. Slavin, Haddon Philadelphia, Pa., and McGahn, Friss and Miller, by Patrick T. McGahn, Jr., Atlantic City, N.J., for plaintiffs.

La Brum & Doak, by John L. White, Woodbury, N.J., and Condon & Forsyth, by Rudolph V. Pino, Jr., Patricia A. Fried, New York City, for defendants, Agusta S.p.A., Costruzioni Aeronautiche Giovanni Agusta S.p.A., Gruppo Agusta and Agusta Aerospace Corp.

Schnader, Harrison, Segal & Lewis, by George E. Rahn, Jr., Ralph G. Wellington, Philip G. Kircher, Deborah L. Guerra, J. Denny Shupe, Philadelphia, Pa., for defendant, Paramount Aviation Corp.

OPINION

GERRY, Chief Judge:

This case arises from the notorious helicopter crash on October 10, 1989 in Lacey Township, New Jersey, in which three top executives in Donald Trump's organization were killed. Plaintiffs are the three Trump owned Atlantic City casinos (collectively "Trump") and Helicopter Air Services, Inc., a Delaware corporation with its principal place of business in Linden, New Jersey. Defendants are Costruzioni Aeronautiche Giovanni Agusta S.p.A. ("CAGA"), Agusta S.p.A., and Gruppo Agusta (collectively "Agusta"), the Italian corporate entities that manufactured the Agusta A109 helicopter that crashed in the above accident; their United States subsidiary, Agusta Aviation Corporation ("AAC"); and Paramount Aviation, Inc. ("Paramount"), which was "in the business of operating, maintaining and managing the helicopter." Complaint (Compl.) ¶ 9. (Paramount also employed the pilot of the helicopter, who also died in the crash.)

Plaintiffs filed in New Jersey state court. Defendants removed here. Before the court are plaintiffs' motion to remand and defendants' motion to dismiss. Paramount is named in three of the eight counts and joins in Agusta's motion to dismiss those counts.

The Trump plaintiffs seek recovery on two grounds. First, plaintiffs seek reimbursement of benefits they paid to decedents' beneficiaries under New Jersey's worker's compensation law. Second, plaintiffs invoke eight theories of liability to recover damages flowing from the death of their three "key" employees. Compl. ¶ 32–33. Although framed in eight counts, these damages theories are in essence different ways of articulating a wrongful death claim.

■ Helicopter Air Services seeks to recover $300,000 in damages based on the diminution in value of an Agusta A109 helicopter it owns, a cause of action arising solely as "a further result of the conduct of the Defendants and the public mistrust

over the safety of continued operation of the Agusta 109 helicopters" since the October 10, 1989 crash. Compl. ¶ 38. Defendants argue that such a cause of action is "frivolous" and should be "summarily dismissed." We agree. Helicopter Air Services has not opposed the motion, which will be granted.

The motion to remand turns on two issues. First, defendant Agusta S.p.A. removed on the basis that it is an Italian corporation, owned by the Italian government, and so qualifies for removal as a "foreign state." Plaintiffs challenge Agusta's status as a "foreign state." Second, plaintiffs argue that the presence of a non-diverse New Jersey defendant, Paramount Aviation, makes removal improper. Defendants argue that removal is proper at the sole discretion of the "foreign state," despite the presence of a non-diverse defendant. We find that defendant Agusta S.p.A. was entitled to remove this action regardless of the presence of a non-diverse defendant, and will therefore deny the motion to remand.

The key question regarding plaintiffs' claim for reimbursement of worker's compensation benefits is whether defendants received statutory notice from plaintiffs. Because we find that plaintiffs did not provide the expressly provided statutory notice, we will grant summary judgment for defendants on this claim.

The threshold question raised by defendants on their motion to dismiss is whether a corporation can ever recover damages flowing from the death of its employees. Defendants argue that courts have unanimously held that a corporation may not recover for losses arising from the death (as opposed to injury) of its employees; and that no matter what theories of liability plaintiffs invoke, at bottom this is a wrongful death action, and corporations are not a statutorily approved beneficiary of such

damages. No matter how properly plaintiffs may have stated a claim for strict liability or negligence, for example, the basis of their claim is the damages they have suffered from the death of their three employees, and defendants assert that that is an impermissible basis for recovery by a corporation. We agree and will dismiss the complaint.[1]

Defendants also attack plaintiffs' theories of liability in Count VI, "wilful destruction and spoilation of evidence, and breach of agreement to preserve trial evidence and fraud"; and Count VIII, "wilful, intentional interference with contractual employment relations." These counts name only the Agusta defendants. We find that New Jersey does not recognize the cause of action in Count VI, and plaintiffs fail to state a claim against these defendants under Count VIII. These counts would therefore be dismissed even if plaintiffs were entitled to seek damages arising from the death of their employees.

## I. FACTS

The following facts are drawn from the complaint and are accepted as true for purposes of the motion to dismiss:

13. Sometime prior to 1984, the Defendants Agusta designed a seven place twin turbine helicopter known as the Agusta 109 ("109").

14. The 109 was designed with four metal rotor blades consisting of a front aluminum spar and aluminum honeycomb filler with an aluminum outer skin.

15. The military variant of the 109 was designated the Agusta "109K," and sold to international military establishments, except in the United States, and were equipped with the same main rotor blades....

16. The main rotor blades were designed, built and sold with a represented

---

1. The parties have submitted affidavits on both plaintiffs' motion to remand and defendants' motion to dismiss. Because the court finds the affidavits on the issue of statutory notice essential to deciding the motion to dismiss plaintiffs' claim for reimbursement of worker's compensation benefits, the court will convert the Rule 12(b)(6) motion into a Rule 56 summary judgment motion on that claim. The court will not convert the motion to dismiss plaintiffs' eight count damages claim. The court may consider affidavits regarding the motion to remand without changing the posture of the motion.

service life of 3,000 hours between replacement.

17. Shortly before the introduction of the 109 and 109K, and long before either aircraft achieved 3,000 hours on the main rotor blades, the Agusta Defendants received reports of design and manufacturing defects that resulted in cracks developing in the main rotor blades.

18. The cracks, some of which were usually invisible to the unaided eye, were generally accompanied by vibrations of varying magnitude, which could not be adjusted out of the helicopter through normal maintenance techniques.

19. At all times, the Agusta Defendants held themselves out as experts in the design, construction and maintenance of helicopters and the ultimate authority on the 109 and 109K, upon which expertise the Plaintiffs, the United States Government, and the Italian equivalent of the Federal Aviation Administration relied.

20. Long prior to 1989, the Defendant Paramount acquired the rights to operate the [109] helicopter in charter service under the Paramount certificate of authority.

21. Paramount then arranged and performed management and maintenance of the [109] helicopter, operation of the helicopter under Part 135 of the Federal Aviation Regulations in helicopter taxi service, and was responsible for the scheduling, inspections, maintenance and overhaul of the helicopter and its components.

22. From the very first day the helicopter was delivered to a retail customer and regularly prior to October 10, 1989, the helicopter suffered vibrations identified as emanating from the main rotor blades, especially during translational lift—that period when the flight of the helicopter changes from forward flight to hover and vice versa.

23. Consultations and maintenance performed by and with the Agusta Defendants, by predecessor lessees, Paramount and the Plaintiffs about this vibration resulted in no improvement in the vibration, but rather assurances were given in Philadelphia, Pennsylvania, Mor-

ristown, New Jersey and elsewhere, that the vibration was within normal limits and the [109] helicopter was safe for normal operation.

24. Notwithstanding the assurances given by the Agusta Defendants to Paramount, the Plaintiffs, and predecessor lessees, Agusta and Paramount knew that other Agusta 109 and military and 109K helicopters with similar vibrations had suffered catastrophic or near catastrophic rotor blade failures.

25. Notwithstanding the assurance afforded, the Agusta Defendants and Paramount knew that the very sister ship to the [109] helicopter [that crashed and killed plaintiffs' employees] had suffered a crack in a main rotor blade after similar reports of vibration only one year before October 10, 1989.

26. Notwithstanding the[se] assurances ..., the Agusta Defendants and Paramount knew that the inevitable result of the vibration would be rotor blade failure and the certain loss of life and serious personal injury resulting therefrom.

27. In August 1989 and again in September of 1989, the helicopter [that crashed] was brought to the Agusta Defendants for further examination of the rotor system vibration, and again the Agusta Defendants assured Paramount and the flight crew that the vibration was within normal limits.

28. Aboard the helicopter [at the time of the crash] were three passengers, Stephen Hyde, Mark Etess and Jonathan Benanav, all of whom were killed.

29. At the time of his death, Stephen Hyde was employed by Plaintiffs Taj Mahal, Castle and Plaza as Chief Executive Officer, and in that capacity had overall responsibility for the entire Atlantic City casino operations of the Plaintiffs.

30. At the time of his death, Mark Etess was employed by the Taj Mahal as its Chief Operating Officer, and in that capacity had overall responsibility for the completion and opening of that casino, together with its day to day operations, including the planning and development of mega events, casino business develop-

ment, operations and accounting and implementation of controls.

31. At the time of his death, Jonathan Benanav was employed by the Trump Plaza as Vice President in charge of non-casino operations and was responsible for all food and beverage services in that casino and was to assume the role as head of all non-casino operations of the Plaintiffs' Atlantic City casino operations.

32. All of the decedents were employed in capacities critical to the successful operation of the Plaintiffs, were key employees upon whose services the Plaintiffs relied and depended for the successful continuation of their business enterprises.

33. All of the decedents were crucial management personnel without whose services the Plaintiffs have and will suffer financial damages including, but not limited to:

 a. Loss of the value of their services;
 b. Loss of revenue;
 c. Increased expenses and cost of operation;
 d. Higher costs for replacement personnel;
 e. Financial losses far exceeding the cost to the Plaintiffs for the services of the deceased;
 f. Damages to the casino operations as a result of managerial inefficiency;
 g. Loss of mega events and the resultant loss of income;
 h. Other damages as yet unfolding, both as to category and amount.

34. The Plaintiffs were under contract to the deceased Hyde and Etess to pay half of their salaries for a period of two years following their death, and as a result of the death of Hyde and Etess, the Plaintiffs have [paid] and will pay substantial sums of money pursuant to the[se] contracts.

*Id.,* ¶¶ 13–34.

## II. MOTION TO REMAND

Because the motion to remand addresses the subject matter jurisdiction of the court, we turn to it first. Defendant Agusta S.p.A. removed this action from New Jersey state court on August 10, 1990.

### a) *Removal Was Proper*

 Plaintiffs argue that removal was improper because defendant Agusta S.p.A. ("Agusta") does not qualify as a "foreign state" under the removal provision in 28 U.S.C. § 1603(a). This is so for two reasons. First, Agusta is not a "foreign state" because neither the notice of removal nor the affidavit submitted by Emilio Fraipont, counsel for Agusta, establishes that Agusta is owned by the Italian government. Second, Agusta is not a "foreign state" because of the link between the three Italian corporate defendants and their wholly-owned United States subsidiary, defendant Agusta Aviation Corporation ("AAC"). AAC is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania, and a wholly-owned subsidiary of the Agusta defendants. Compl. ¶ 8. Defendants argue that ownership of a United States subsidiary does not make Agusta a citizen of the United States.

Plaintiffs further argue that removal was improper because the court does not have authority to exercise pendent party jurisdiction over defendant Paramount Aviation. Thus, the case should be remanded in its entirety.

The removal statute provides, in relevant part:

> Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

28 U.S.C. § 1441(d).

### 1. Agusta Is A "Foreign State" Under Section 1603(a)

Defendant Agusta, S.p.A. filed a notice of removal on August 10, 1990. The notice alleged:

2. The underlying action is an action brought against a "foreign state" as defined in 28 U.S.C. § 1603(a). Defendant Agusta, S.p.A. was at the time that this action was commenced, and still is, an "agency" or "instrumentality" of the Government of Italy within the meaning of the Foreign Sovereign Immunities Act [("FSIA"), 28 U.S.C. § 1602 *et seq.*] and therefore defendant ... is considered a "foreign state" as defined by 28 U.S.C. § 1603(a)....

3. Defendant, Agusta S.p.A. is neither a citizen of a state of the United States as defined by 28 U.S.C. §§ 1332(c) and (d) nor has it been created under the laws of any third country.

*Id.* ¶¶ 2–3. On its face the notice sets forth an adequate basis for removal.

An "agency or instrumentality" of a foreign state is an entity:

(1) which is a separate legal person, corporate or otherwise; and

(2) which is an organ of a foreign state or a political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof; and

(3) which is neither a citizen of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). The first requirement is not in dispute. Plaintiffs argue first that neither the notice of removal nor the Fraipont affidavit establishes that the Italian government owns Agusta S.p.A. Further, while the notice does declare that Agusta S.p.A. is not a citizen of the United States, Agusta should be considered a United States citizen because of defendant AAC, a wholly-owned United States subsidiary of Agusta. Thus, plaintiffs assert,

Agusta fails (2) and (3) above and does not qualify as an "agency or instrumentality" of a foreign state.

### A. *The Italian Government Owns Agusta*

Agusta states that the Italian Government owns and controls Agusta S.p.A. through the state agency, Ente Partecipazioni e Finanziamento Industria Manifatturiera ("EFIM"). *See* Affidavit of Rudolph V. Pino, counsel for the Agusta defendants, at ¶ 7; Affidavit of Emilio Fraipont, general counsel for Agusta, at ¶¶ 6–11. The Fraipont affidavit sets forth the relationship between Agusta S.p.A. and the Italian government:

5. Defendant Agusta S.p.A. functions primarily as a holding company and prior to November 1988 [when it merged with CAGA] was not directly engaged in the business of the design, manufacture, maintenance and or sale of aviation products.

6. Agusta S.p.A. is owned and controlled by the Italian Government through Ente Partecipazioni e Finanziamento Industria Manifatturiera ("EFIM")[,] the state owned agency created to own, supervise and manage companies that are important to the national interest.

*Id.* ¶¶ 5–6. EFIM owns and controls MCS S.p.A., which is EFIM's "financial operating company." *Id.* ¶ 11. MCS S.p.A. in turn owns Aviofer Breda S.p.A., "an entity which holds the shares of the companies in the aviation sector" under EFIM. *Id.* Aviofer Breda owns 98.9% of the shares of Agusta S.p.A. *Id.* Thus, the Italian government owns and controls at least 98.9% of the shares of defendant Agusta S.p.A.[2]

**2.** Plaintiffs submit the affidavit of Andrea Castellucci, an Italian corporate lawyer, prepared in response to a previous affidavit given by Emilio Fraipont in a related case arising from the same accident, *Kent v. Agusta Aerospace Corporation,* Civil Action No. 90–2233 (E.D.Pa.). However, this affidavit is not based on personal knowledge, nor was it prepared in response to the affidavit of Mr. Fraipont submitted in *this* action. It is Castellucci's "opinion that under Italian law, the three [defendant] companies are

not owned, operated, controlled nor are they instrumentalities of the Italian Government, but rather are private corporations." The affidavit focuses on facts gleaned from "official sources" (much in the manner of news reporting) that defendants are private companies, created by private contract, were not established by the Italian government, are not regulated by the government, and have no public power or function. We note, crucially, that the Castellucci affidavit neglects to examine the relationship

However, plaintiffs argue that the link between Agusta and the Italian government is too remote, that Agusta has not established that the Italian government has "a majority ownership in the defendant itself." Plaintiffs' Reply Brief (PRB) at 4. This is so because "none of the defendants in this case are public Italian corporations, but rather are all private Italian business corporations ... which may at some point many times removed be owned by agencies of the Italian government." *Id.* at 3, 6. Plaintiffs concede that "[t]he Italian government, through EFIM, clearly has some degree of involvement with Agusta," but argue that the "nexus" is insufficient. *Id.* at 4. It would be one thing if the Italian government owned Agusta directly, they argue, but it is another (and too remote) to have EFIM wholly own MCS, MCS wholly own Aviofer Breda, and finally Aviofer Breda own 98.9% of Agusta. This, plaintiffs argue, is not the type of ownership contemplated by section 1603(b)(2). *Id.*

Section 1603(b)(2) specifies that an "agency or instrumentality" of a foreign state is any entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." It is irrelevant whether Agusta is a public corporation or a private corporation, so long as the Italian government has a majority ownership interest in Agusta. It does so, through EFIM, as set forth in the Fraipont affidavit.

The Second Circuit considered a similar case in *O'Connell Machinery Co. v. M.V. "Americana"*, 734 F.2d 115, 116 (2d Cir.), *cert. denied*, 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984):

> According to the affidavit of Gerardo Carante, Chief Officer of the Commercial Office at the Embassy of the Republic of Italy in Washington, a majority of the shares of the Italian Line is owned by the Societa' Finanziaria Marittima (FINMARE). FINMARE, in turn, is under the direct control of the Istituto per la Ricostruzione Idustriale [IRI], a public financial entity which coordinates the management of the commercial enterprises of the Italian Government. Based on these facts ... the district court correctly concluded that the Italian Line qualifies as an agency or instrumentality of the Republic of Italy.

> The fact that the Italian Government saw fit to double-tier its administrative agencies did not compel a holding to the contrary. According to the legislative history of the FSIA, political subdivisions were intended to include "all governmental units beneath the central government." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6613. FINMARE fits comfortably within this definition.

*Id.*, 734 F.2d at 116–117 (citations omitted). If we put Agusta in a position analogous to the Italian Line, then EFIM is analogous to IRI. EFIM is "the state owned agency created to own, supervise and manage companies that are important to the national interest." Fraipont Affidavit ¶ 6. IRI is "a public financial entity which coordinates the management of the commercial enterprises of the Italian government." 734 F.2d at 116. The Second Circuit held that the "double-tier" of FINMARE and IRI (both administrative agencies) did not disturb the Italian Line's "foreign state" link. The link between Agusta and EFIM is triple-tiered (Agusta to Aviofer Breda, to MCS, to EFIM), an insufficient basis on which to distinguish this case from *O'Connell* in this regard.

Plaintiffs further argue that Agusta is not the "type of entity" contemplated by the statute, and refers the court to the FSIA legislative history:

> As a general matter, entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enter-

---

between the Italian government and EFIM, the government agency which is the vital link between defendants and the Italian government. We therefore reject Castellucci's "opinion" sur-

mised from "official sources" in favor of Mr. Fraipont's analysis, based on his sworn personal knowledge.

prise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.Code Cong. & Ad. News 6604, 6614. As plaintiffs note, the list above was "[b]y way of illustration." PRB at 5. However, plaintiffs would have the court read this as an exclusive rather than an illustrative list. We reject that conclusion.

We thus conclude that Agusta satisfies section 1603(b)(2).

### B. *Agusta Is A Citizen Of Italy*

The complaint recognizes that CAGA is "a corporation organized and existing under the laws of the Nation of Italy, and not a citizen of the United States." Compl. ¶ 5. Further, Agusta S.p.A. is "a corporation organized and existing under the laws of the Nation of Italy, and not a citizen of the United States." *Id.* ¶ 6. Gruppo Agusta is "an acronym selected by the Agusta Defendants to describe the totality of the Agusta aviation operations to include helicopter, military, and civilian aircraft activities.... This entity is organized under the laws of the Nation of Italy, and *does not have its principal place of business in the United States* ... although it is represented in the United States through the wholly-owned subsidiary and affiliate known as Agusta Aviation Corporation." Compl. ¶ 7 (emphasis added). These three defendants (collectively "Agusta") are in essence one entity, and will be treated as such for purposes of this motion.[3] Moreover, defendant AAC is alleged to be a subsidiary of each of them.

A corporation is deemed to be a citizen of any state by which it has been incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c). The statute does not provide that a foreign corporation becomes a United States citizen by fact of its ownership of a United States subsidiary. *See Bailey v. Grand Trunk Lines*, 609 F.Supp. 48 (D.Vt.1984), *aff'd in part*, 805 F.2d 1097 (2d Cir.1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 94, 98 L.Ed.2d 54 (1987) (foreign corporation not citizen of United States despite ownership of United States subsidiary). A corporation can only have one principal place of business. *Bailey*, 805 F.2d at 1100; *United States Fidelity & Guaranty Co. (U.S.F. & G.) v. Di Massa*, 561 F.Supp. 348 (E.D.Pa.1983), *aff'd*, 734 F.2d 3 (3d Cir.1984). Agusta S.p.A.'s principal place of business is in Milan, Italy. Fraipont Aff. at ¶ 3. We conclude, then, that Agusta's relationship to AAC does not destroy its status as a "foreign state" for removal purposes.

Plaintiffs urge that the court should give greater weight to the United States citizenship of the subsidiary AAC, because of what plaintiffs see as a remote link between Agusta and the Italian government: "In short, if ownership so remote by EFIM is critical to [Agusta's] status as a foreign state, shouldn't [the citizenship of] a subsidiary which without dispute is the sole operating entity in the United States and clearly outside the Act under subsection (b)(3)[,] be of at least equal ... weight in determining for purposes of its conduct in this case its country of citizenship?" PRB at 2. This argument sidesteps the insurmountable hurdle that a corporation may have only one principal place of business. For Agusta that place is Milan, Italy, and ownership of a United States subsidiary does not disturb that fact.

### 2. The Court May Properly Exercise Pendent Party Jurisdiction Over Defendant Paramount Aviation

█ Plaintiffs' second basis for remand is that since the court has no alternative basis of jurisdiction over defendant Paramount, it must remand the entire action. First, there is no diversity jurisdiction since the Trump plaintiffs are New Jersey entities and Paramount is a New Jersey corporation. Second, there is no federal question jurisdiction. The parties agree on these two points. Third, the court cannot

---

3. Defendants state that of "[o]n November 30, 1988, Costruzioni Aeronautiche Giovanni Agusta S.p.A. ("CAGA") was merged into Agusta S.p.A. and, under Italian law, [Agusta S.p.A.] is the successor of CAGA." Fraipont Affidavit at ¶ 4.

properly exercise pendent party jurisdiction over Paramount. Defendants disagree. So do we.

Section 1441(d) provides for the removal of any action by a foreign state as follows, in relevant part: "*Any* civil action brought in a State court against a foreign state . . . may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(d) (emphasis added).

The jurisdiction of the federal courts over claims involving foreign states is conferred pursuant to section 1330(a), which provides in relevant part: "The district courts shall have original jurisdiction without regard to amount in controversy of *any* nonjury civil action against a foreign state as defined in section 1603(a)." 28 U.S.C. § 1330(a) (emphasis added). (All removed actions are to be nonjury under section 1441(d).)

The legislative history establishes that Congress anticipated cases such as this case, where a foreign state is joined with non-foreign defendants:

> In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a Federal forum actions brought against them in the State courts. New subsection (d) of section 1441 permits the removal of any such action at the discretion of the foreign state, even if there are multiple defendants and some of these defendants desire not to remove the action *or are citizens of the state in which the action has been brought.*

H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. 32, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 6631 (emphasis added).

Plaintiffs note that the FSIA does not grant *exclusive* jurisdiction in the federal courts, but also permits state court actions. Plaintiffs Brief ("PB") at 18. From that fact plaintiffs argue that the statute does not "expressly provide for removal of an entire action pending in state court against all defendants, regardless [of] whether an independent basis of jurisdiction exists over defendants other than the foreign sovereign." *Id.* at 18–19. However, the above legislative history is to the contrary. Plaintiffs describe this passage from the legislative history as ambiguous, since "there may be an independent basis of federal jurisdiction over defendants which are citizens of the state where the action has been brought." PB at 19, n. 1. However, the underlined passage would be superfluous if federal question jurisdiction existed, since those parties would clearly be removed with the foreign state. The passage is only significant to the extent it provides an exception to the diversity requirement, and underscores the extent of the "discretion" granted the foreign state.

Plaintiffs argue that the recent Supreme Court decision in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), dictates that the lack of subject matter jurisdiction over defendant Paramount requires the court to remand the entire case. The *Finley* Court reasoned:

> The [Federal Tort Claims Act] FTCA, § 1346(b) confers jurisdiction over "civil actions on claims against the United States." It does not say "civil actions on claims that include requested relief against the United States," nor "civil actions in which there is a claim against the United States"—formulations one might expect if the presence of a claim against the United States constituted merely a minimum jurisdictional requirement, rather than a definition of the permissible scope of FTCA actions. Just as the statutory provision "between . . . citizens of different States" has been held to mean citizens of different states and no one else, so also here we conclude that "against the United States" means against the United States and no one else. "Due regard for the rightful independence of state governments . . . requires that [federal courts] scrupulously confine their own jurisdiction to the precise limits which the statute has defined." The statute here defines jurisdic-

tion in a manner that does not reach defendants other than the United States. 490 U.S. at 552–53, 109 S.Ct. at 2008–09 (citations omitted). Plaintiffs argue that this passage from *Finley*, although in a different context, still controls this case, and bars the exercise of pendent party jurisdiction where the case involves a defendant that is not a foreign state and there is no alternative basis for the court to exercise its jurisdiction over that defendant. Plaintiffs concede that neither *Finley* nor any of the cases upon which they rely address the issue of jurisdiction over pendent parties under the removal statute, nor involve the FSIA. PB at 16. Plaintiffs argue that *"Finley* clearly requires a close examination of the language of the jurisdictional statute invoked and congressional intent." PRB at 8. *See Finley*, 490 U.S. at 552–56, 109 S.Ct. at 2008–10; *Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1296 (2d Cir.1990). Defendants argue that *Finley* is inapposite because of "the distinction in the relevant statutory grants of jurisdiction." Agusta Defendants' Brief ("DB") at 15.

As defendants note, the jurisdictional provision of the FSIA is quite broad, conferring jurisdiction over "[a]ny civil action brought in a state court against a foreign state as defined in section 1603(a)." 28 U.S.C. 1330(a). In *Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404 (9th Cir.1989) (decided after *Finley* and construing the FSIA), the court found that the FSIA permits pendent party jurisdiction because no language in the statute limits jurisdiction to a certain category of parties:

> unlike the [Federal Tort Claims Act] FTCA, the FSIA extends federal jurisdiction over *"any* civil action" against a foreign state—a phrase which tends to affirmatively exclude the sort of unspoken qualification read into the statute in *Finley*.

*Teledyne*, 892 F.2d at 1409 (emphasis original). Moreover,

> If Congress wanted nothing more than to assure foreign states the right to a federal forum, it could have provided for *separation* of the claims against the foreign

state from claims against other parties. Instead, Congress opted to give foreign states the right to a federal forum, *and* the right to take non-consenting co-defendants along with them. At the very least, subsection 1441(d) expresses an intention to give sovereign foreign defendants an absolute right to a federal forum coupled with an unusually strong preference for the consolidation of claims. We conclude that those preferences are expressed strongly enough to overcome any presumption against pendent party jurisdiction.

*Id.* (emphasis original). Although diversity provided an independent basis for federal jurisdiction over the pendent party in *Teledyne*, that fact does not undermine the force of the *Teledyne* court's reasoning, nor its reading of the legislative history of the FSIA: "the federal district courts have jurisdiction over 'any civil action against a foreign state'." *Id.* at 1410. *Accord Nolan v. Boeing Co.*, 919 F.2d 1058, 1064–66 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1990).

We agree and find that removal was proper.

## III. MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

Both the Agusta defendants and Paramount move to dismiss for failure to state a claim, pursuant to Rule 12(b)(6). In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, "we must take all allegations and reasonable inferences which can be drawn [from the complaint] as true and view them in the light most favorable to the plaintiff[s]." *District Council 47, American Federation v. Bradley*, 795 F.2d 310, 313 (3d Cir.1986). We may dismiss the complaint only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle them to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted).

Summary judgment as to the claim for reimbursement of worker's compensation benefits is appropriate only if there is no genuine issue of material fact and defen-

dants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is "genuine" only if a reasonable jury, considering the evidence presented, could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

The eight-count complaint sets forth two bases for relief, linked to eight theories of liability against defendants Agusta and, in three counts, also against Paramount. These include: strict liability in tort; fraud (also against Paramount); gross negligence, willful misconduct, wantonness, and outrageous conduct (Paramount, too); negligence (Paramount, too); breach of express and implied warranties; willful destruction and spoilation of evidence, and breach of agreement to preserve trial evidence and fraud; fraud and deceit; and willful, intentional interference with contractual employment relations.

Plaintiffs first seek reimbursement of worker's compensation benefits paid to the statutory beneficiaries of the three Trump executives killed in the helicopter crash: "Under the New Jersey worker's compensation law specifically, the Plaintiffs are entitled to recover from the Defendants the sums paid or hereafter to be paid under that Act to or in behalf of the decedents' statutory beneficiaries." Compl. ¶ 36.

The second basis for recovery is broader, encompassing reimbursement not only of worker's compensation benefits, but also of contractual death benefits, as well as damages arising from the death of the Trump executives: "Under the authority of *Interstate Telephone and Telegraph Co. v. Public Service Electric Co.*, 86 N.J.L. 26, 90 A. 1062 (1914), the Plaintiffs are entitled to recover all sums paid to and in behalf of the decedents' estates by contract, all losses suffered by the Plaintiffs as a result of the conduct of the Defendants due to the loss of the value of the services of the deceased and all sums paid under the worker's compensation statute." *Id.* ¶ 37.

a) *Plaintiffs Failed To Provide Statutory Notice And So Are Barred From Seeking Reimbursement of Worker's Compensation Benefits Paid To Decedents' Dependents*

■ Plaintiffs seek reimbursement of monies paid under the New Jersey worker's compensation statute to the statutory beneficiaries of decedents Hyde, Etess and Benanav. The complaint alleges:

35. Under the worker's compensation law of the State of New Jersey, the Plaintiffs are obligated to pay the estates of the deceased Hyde, Etess and Benanav, various sums for funeral expenses, benefits to certain statutory beneficiaries, all of which payments are solely and proximately the result of the conduct of the Defendants.

36. Under the New Jersey worker's compensation law specifically, the Plaintiffs are entitled to recover from the Defendants the sums paid or hereafter to be paid under that Act to or in behalf of the decedents' statutory beneficiaries.

Compl. ¶¶ 35–36.

Defendants argue that "[b]ecause plaintiffs have not complied with the exclusive statutory prerequisites, they are not entitled to maintain an action for reimbursement." DB at 19. Specifically, plaintiffs have failed to perfect a statutory lien for third-party recovery under section 15–40 of the New Jersey Workmen's Compensation Act ("the Act"), N.J.S.A. 34:15–40(d) and (g), and are therefore barred from seeking reimbursement from defendants.

The Act provides, in relevant part:

If at any time prior to the payment by the third person or his insurance carrier to the injured employee or his dependents, the employer or his insurance carrier shall serve notice, as hereinafter provided, upon such third person or his insurance carrier that compensation has been applied for by the injured employee or his dependents[,] it shall thereupon become the duty of such third person or

his insurance carrier, before making any payment to the injured employee or his dependents, to inquire from such employer or his insurance carrier the amount of medical expenses incurred and compensation theretofore paid to the injured employee or to his dependents.... *Service of notice ... shall be by registered mail, return receipt.*

N.J.S.A. 34:15–40(d) (emphasis added). "[S]ubparagraph (d) allows the employer or his carrier to recover monies paid by him to his employee for injuries caused by the wrongful act of a third person, while at the same time [it] protects the third person from paying double damages by requiring the employer or his compensation carrier to serve notice of the compensation lien on the tortfeasor before he pays the employee." *Wager v. Burlington Elevators, Inc.*, 116 N.J.Super. 390, 397, 282 A.2d 437 (1971). "The intent of the act is to apprise the third person, wrongdoer, that the employer makes claim under the law for a deductible amount from a judgment against such third person." *Erie R. Co. v. Michelson*, 111 N.J.Eq. 541, 162 A. 764, 766 (1932).

Subparagraph (g) of the same section provides:

> If such employee or his dependents effect a settlement with the third person or his insurance carrier or institute proceedings against the third person prior to the service of notice upon the third person or his insurance carrier ... or prior to the institution of any proceedings against the third person by the employer ..., *such employer* or his insurance carrier *is barred from instituting any action or proceedings against the third person* for the injuries and loss sustained by such employee or his dependents.

*Id.* (emphasis added). As defendants argue, subparagraph (g) prevents the employer from bringing a subrogation type action against a third party once the employee or his dependents have settled or instituted proceedings against the third party. DB at 21; *Wager*, 116 N.J.Super. at 397, 282 A.2d 437.

Thus, the plaintiffs are barred from seeking reimbursement by defendants unless they served the written notice of lien upon defendants before defendants settled with decedents' beneficiaries. *See Danesi v. American Mfrs. Mut. Ins. Co.*, 189 N.J.Super. 160, 166, 459 A.2d 686, *certif. den.*, 94 N.J. 544, 468 A.2d 194 (1983) ("failure to perfect the lien pursuant to subsection (d) means that neither the third-party tortfeasor nor his insurance carrier can be compelled to pay over any of the third-party recovery proceeds" to employer).

■ Plaintiffs respond that the issue of notice cannot be resolved on a motion to dismiss. Rather, it "is a proper area of inquiry for discovery" and defendants' argument "is in reality a defense which must be raised at trial, and which should not, and cannot, be resolved on the pleadings." PB at 27. It is sufficient to state a claim, plaintiffs allege, for the complaint to state that plaintiffs are entitled to reimbursement pursuant to the Act. Implicit in such an allegation, however, is that plaintiffs have complied with all relevant provisions of the Act. Although the complaint states conclusorily that plaintiffs are entitled to reimbursement pursuant to the Act, it does not set out the facts to indicate compliance with that law. Defendants challenge the conclusory allegation by submitting an affidavit that demonstrates that plaintiffs failed to perfect their lien, and so may not recover against defendants. Plaintiffs would have the court disregard the Pino affidavit and permit plaintiffs to pursue discovery to develop their claim. However, any evidence that exists that plaintiffs served the proper statutory notice would be within plaintiffs' control, and discovery would reveal nothing further than what plaintiffs must already know on the issue of notice.

Defendants assert that plaintiffs have not served notice of their lien. Defendants have submitted an affidavit in support of their contention that notice has not been served, and that "[s]ettlement agreements with the Agusta defendants were entered into by the dependents of decedents Etess and Hyde on April 18, 1990[,] and with the dependents of decedent Benanav on April 29, 1990." *See* Affidavit of Rudolph V.

Pino, Jr. at ¶¶ 8–10 and Exhs. B–D. Payment has been made by the Agusta defendants on these settlements. *Id.* Plaintiffs have not served the statutory notice. *Id.* at ¶ 11; Affidavit of Vincent Genovese, vice president finance and administration, Agusta Aerospace Corporation, ¶ 3 (AAC "has not received any notification of a lien held by the plaintiffs for workmen's compensation payments").

■ Plaintiffs argue that "defendants clearly had actual notice prior to settlement that worker's compensation benefits had been applied for." PB at 27. However, plaintiffs do not argue that they complied with the statutorily required written notice mailed by "registered mail, return receipt." The statute does not provide merely that notice be given, but also describes explicitly the proper form of notice. Thus, the type of actual notice upon which plaintiffs rely, namely that defendants were "served with" a copy of a memorandum setting forth "our intentions to assert a claim for worker's compensation benefits on behalf of The Trump Organization" during the pendency of injunctive hearings before Judge Lord of the Eastern District of Pennsylvania in October 1989, clearly is not the notice required by the statute. *See* Supplemental Affidavit of Richard E. Genter, plaintiffs' counsel, ¶¶ 2–9; Plaintiffs' Supplemental Brief ("PSB") at 9.

Plaintiffs argue that "New Jersey courts have not insisted on literal compliance with the notice provision where, as here, written notice was actually received." PSB at 9. Plaintiffs rely on *Travelers Insurance Co. v. Gardner*, 129 N.J.L. 159, 28 A.2d 507 (1942), in which the proper statutory notice was sent and received by an employee of the defendant trustee, and the court deemed that receipt by the employee was the equivalent of receipt by the defendant. *Id.* at 161, 28 A.2d at 508–09. However, *Travelers* is inapposite because there *someone* representing the defendant received the statutorily required notice; here, no such notice was sent, much less received by an employee of any of the defendants. The other case relied on by plaintiffs is also inapposite. In *Wager v. Burlington Ele-*

*vators, Inc.*, 116 N.J.Super. 390, 282 A.2d 437 (Law Div.1971), notice was served by certified rather than registered mail and deemed sufficient. Here, neither certified nor registered mail was used. These two cases do not support plaintiffs' efforts to bypass the statute's clear requirement that "[s]ervice of notice … shall be by registered mail, return receipt."

If we consider the affidavits submitted on the reimbursement claim, we must convert the 12(b)(6) motion to a motion for summary judgment pursuant to Rule 56. The court finds this to be the appropriate course. Accordingly, having found that plaintiffs failed to provide the explicitly required statutory notice and are therefore barred from seeking reimbursement of worker's compensation benefits, we will grant summary judgment for defendants on plaintiffs' claim for such reimbursement.

b) *Damages Arising From Death Of Trump Executives*

Plaintiffs allege a common law right to recover for economic damages flowing from the death of their employees. Defendants argue that no such common law right exists and that this case is controlled by the New Jersey wrongful death statute, which also does not permit plaintiffs to recover damages arising from the death of their employees.

1. New Jersey Common Law Does Not Grant Plaintiffs a Right of Recovery

The parties agree that New Jersey state law governs this case. Plaintiffs' eight theories of liability for damages flow from two premises that they argue are supported by decisions of the New Jersey Supreme Court. First, plaintiffs assert that a corporation may recover for losses arising from the death of its employees. Plaintiffs rely on *Interstate Telephone* as having recognized this right initially, and on *United States Casualty Co. v. Hercules Powder Co.*, 4 N.J. 157, 72 A.2d 190 (1950), as later having "embraced an employer's common law right of action to recover for the death of its employees." DSB at 3. Defendants argue that neither *Interstate Telephone*

nor *Hercules Powder* grants plaintiffs' such a right, and that plaintiffs are barred from bringing what is in essence a wrongful death action. Therefore, defendants argue, the entire complaint should be dismissed.

Second, plaintiffs assert that they are entitled to recover what are purely economic damages, albeit damages that are the direct result of the death of the Trump employees. Plaintiffs rely on *People Express Airlines, Inc. v. Consolidated Rail*, 100 N.J. 246, 495 A.2d 107 (1985) for the proposition that they are entitled to recover the economic damages to their businesses that resulted from the death of their employees. Defendants argue that *People Express* is inapposite because that case did not involve personal injury to any of the plaintiff's employees.

### A. *Interstate Telephone* and *Hercules Powder* Do Not Support Plaintiffs' Cause of Action

■ Plaintiffs cite *Interstate Telephone & Telegraph Co. v. Public Service Electric Co.*, 86 N.J.L. 26, 90 A. 1062 (1914), as having "recognized the right of an employer to recover for loss of services of his employee due to the tortious act of a third party." PB at 13; PSB at 2. Plaintiffs do not quote the particular language in *Interstate Telephone* which supports that conclusion, but the likely language is that "the right of an employer to recover for loss of services of his employe[e] is well settled, and is not questioned by the present defendant." 90 A. at 1062. (Since the defendant in *Interstate Telephone* did not question that right, the issue was not before the court. Defendants thus accurately describe the above passage as *dicta*.) The "case involve[d] the novel question whether the employer [wa]s entitled also to recover a sum which he ha[d] contracted to pay his employe[e]." *Id.* The court held that where an employee was injured by the tortious act of a third party, and the employer and employee had agreed that the employer would pay the employee a portion of his wages while he was on the mend but not working, the employer could not then re-

cover the amount of those benefits from the third party. The court reasoned that "the right to the statutory compensation is a part of the compensation of the employe[e] for services rendered, for which the employer receives a quid pro quo.... It is one of the necessary expenses of the business against which the employer must protect himself by a higher price for his product or lower regular wages for his employe[e]s." *Id.* 90 A. at 1063.

The court distinguished these "wages" from the "damages" to which employers had long been entitled under common law:

The legal right of an employer to recover damages for the loss of services of employe[e]s due to a tortious act of a third person ... never included the wages paid his servants for past work or the wages he might pay for future work. What the employer loses is the value of the services to him; what the present plaintiff seeks to recover is the value of the services to the employe[e]. The employer loses what he might have made over and above the cost of the employe[e]'s services; he does not in any proper sense lose the necessary expense of securing that labor.

*Id.* The court noted that plaintiff had been injured in 1912, while the New Jersey worker's compensation statute was not amended until 1913 to allow such reimbursement of the employer. Thus, in 1914 the court was construing the common law as it had existed before the enactment of the 1913 act (although the court described the issue as "one of first impression"). *Id.* at 1062.

We find the dicta in *Interstate Telephone* on the historic common law right of an employer "to recover for loss of services of his employe[e]" neither controlling nor persuasive here. First, that issue was not before the court. Second, and more important, the context there was an employee's *injury*, here it is death. This is a crucial distinction. Plaintiffs have failed to cite a single case permitting an employer to assert the same common law cause of action after the death of an employee that the employer would have enjoyed in the con-

text of injuries to that employee. Courts have uniformly described such causes of action arising from the death of an employee as wrongful death actions, and barred employers from bringing those claims because employers are not enumerated statutory beneficiaries in wrongful death actions.

Plaintiffs offer the *Hercules Powder* case as the means to leap the distinction between injury and death. But their reliance on *Hercules Powder* is misplaced. Plaintiffs cite the following passage from that case as supporting their cause of action:

> Of course, an *employer* or his subrogee is *free to maintain any primary cause of action which the employer may have directly in his own right* against another, specifically against the seller of an article for the breach of a warranty of its fitness for a particular use, known to the seller, which breach proximately results, inter alia, in injury to or the *death of the purchaser's employee.* Nevertheless the damages recoverable for such breach may not include the compensation payments made pursuant to our Workmen's Compensation Act, which statute provides the exclusive remedy for such recovery.

4 N.J. at 167, 72 A.2d at 196 (emphasis added). Defendants respond first that, while plaintiffs allege breach of warranty, as in *Hercules*, plaintiffs do not have that claim directly in their own right as a primary cause of action, because plaintiffs were not the purchasers of the 109 helicopter that crashed. Second, even if plaintiffs did have a breach of warranty claim here, under *Hercules* their damages could not include workmen's compensation payments. DSB at 7. *See also Multiplex Concrete Co. v. Besser Co.*, 153 N.J.Super. 531, 533, 380 A.2d 708, 710 (1977), *certif. den.*, 75 N.J. 607, 384 A.2d 837 (1978) (where employee killed because of defect in machinery purchased by employer, action to recover workers' compensation payments "not a primary cause of action which the employer has directly in its own right").

■ Plaintiffs do not argue that they were the purchasers of the subject 109 helicopter. However, under Count V they "are proceeding against defendants for breach of their implied warranty that the helicopter was fit for its particular and intended purposes—that is, safe flight." PSB at 4. Plaintiffs argue that "New Jersey courts have extended this warranty protection, in the absence of privity, to situations beyond those contemplated in the Uniform Commercial Code, including claims for economic loss." *Id.*

Plaintiffs rely on *Fashion Novelty Corp. v. Cocker Machine & Foundry Co.*, 331 F.Supp. 960, 965 (D.N.J.1971) to establish their right under New Jersey law to bring a breach of warranty claim, even though they were not the purchasers of the helicopter. That court held:

> Reviewing the state decisional law of New Jersey, there emerges in bold relief the now well settled principle that the New Jersey courts have extended warranty protection—in the absence of privity—to classes of persons and to transactions well beyond those comprehended by the Uniform Commercial Code. More specifically, damages for breach of warranty are now recoverable by an *ultimate user* who has sustained property damage and economic loss; and who has come into possession of the defective goods by means other than by sale and purchase.

*Id.* (citation omitted; emphasis added). The court found "nothing to indicate that [the aggrieved party] United's use of the allegedly defective equipment is by virtue of any other than lawful possession, [and therefore] United stands a user entitled to the relief afforded by the law of New Jersey for breach of implied warranties, and this irrespective of any lack of privity between United and defendant." *Id.*, 331 F.Supp. at 966. However, unlike the "ultimate consumer" who was in possession of the defective product in *Fashion Novelty*, here the Trump organization was not in possession of the subject helicopter, but merely had made arrangements to have three of its executives be passengers at the time of the crash.

The court's reasoning in *Newmark v. Gimbel's Inc.*, 54 N.J. 585, 258 A.2d 697 (1969) at first appears more closely analogous to the facts here. There, the Court held:

> One, who in the regular course of a business sells or applies a product (in the sense of the sales-service hybrid transaction involved in the present case [where a beauty parlor patron was injured by a permanent wave solution]) which is in such a dangerously defective condition as to cause physical harm to the consumer-patron, is liable for the harm. Consumption in this connection includes all ultimate uses for which the product is intended.

*Id.*, 54 N.J. at 595, 258 A.2d at 702. The court described the transaction there as "a hybrid partaking of incidents of a sale and a service. It is really partly the rendering of a service, and partly the supplying of goods for a consideration." *Id.*, 54 N.J. at 593, 258 A.2d at 701. The court found that both the beauty parlor operator and manufacturer were liable.

Here, to describe the Trump organization as the "ultimate consumer" of the subject helicopter is superficially analogous to the *Newmark* case, since conveyance of passengers certainly fits within "all ultimate uses for which the product [was] intended." But can Trump be said to be the "ultimate consumer" of those services, or rather does that term fit only the actual passengers aboard the helicopter? In *Newmark* the plaintiff sued over injuries she personally received. Here plaintiffs are one step removed from what is admittedly not a sales transaction at all, but entirely a service. (Unlike the permanent wave solution, which was totally consumed in the performance of the service in *Newmark*—hence the "hybrid" nature of the transaction—the passenger service offered here cannot be said to have been "the supplying of goods for a consideration"). The analogy to *Newmark* breaks down because there is no aspect of a sale in this case, and the Trump organization was not injured directly, but only as a result of the death of its employees, for whom the service was performed.

This case can be distinguished from all the above cases. In *Hercules* the court found that the employer had a cause of action in its own right because it was the purchaser of the defective product that injured its employee. The product had been purchased by the employer and was in the employer's possession. Not so here. And in those cases which have extended implied warranties beyond the scope of "the traditional sales transaction," the aggrieved party has had possession of the allegedly defective product; or where the transaction was largely service-related, but still had a sales component, the case involved the party actually injured by the service/consumption of the product. Not so here.

## B. *People Express* Is Inapposite Because This Case Does Not Involve Purely Economic Damages

The *People Express* Court wrote that New Jersey law must "strive to ensure that the fundamental application of negligence doctrine advances the fundamental purpose of tort law and does not unnecessarily or arbitrarily foreclose redress based on formalism or technicalisms." *Id.*, 100 N.J. at 255, 495 A.2d at 111. Plaintiffs argue that this means we should not "abandon precedent of longstanding application which is consonant with fundamental precepts of tort law," and so should permit their cause of action. PB at 21. Because "the overarching purpose of tort law [is] that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct," 495 A.2d at 111, the court should not bar plaintiffs from recovering for losses they sustained as a result of the death of their employees.

While the above language from *People Express* would seem at first to support plaintiffs' cause of action, plaintiffs' argument here does not survive close inspection. *People Express* addressed the question "whether a defendant's negligent conduct that interferes with a plaintiff's business resulting in purely economic losses, *unaccompanied by property damage or personal injury*, is compensable in tort." 495 A.2d at 108 (emphasis added). Factual-

ly, therefore, *People Express* is completely inapposite to this case. That case involved recovery for purely economic damages in the absence of "physical harm"—either property damage or personal injury. People Express sought to recover business interruption damages that arose when the company was required to shut down its Newark terminal for 12 hours because of a tank car fire at a nearby Conrail yard. Here, however, we confront the allegation of economic damages *resulting from* personal injury—the death of plaintiffs' employees. This, then, is not the pure case of economic damages in isolation from personal injury, but economic damages arising exclusively from personal injury, an issue not before the *People Express* Court.

*People Express* arose in the context of an inadequately defined area of tort law where no remedy for the wrong suffered had yet been adopted in this state. The Court considered the inequities of a *per se* rule barring recovery for economic damages in the absence of either personal injury or property damage and constructed a narrow standard permitting the award of such damages. While recognizing that such damages were already available in a few specific circumstances, the court set forth a general standard under the "principle of particular foreseeability." 495 A.2d at 116. We need not elaborate that standard here, for it is inapplicable to the facts of this case. It is because the economic damages arise from the death of plaintiffs' employees that this case is a wrongful death action, and not a *People Express* pure economic damages claim. As discussed below, the legislature set the parameters of those entitled to recover for economic damages arising from wrongful death, and plaintiffs simply are not so entitled.

2. The New Jersey Wrongful Death Statute Bars Plaintiffs From Recovering Damages Here

▮ Defendants argue that plaintiffs' claims are a masquerade for what is at bottom a wrongful death action, for which plaintiffs may not recover. The New Jersey wrongful death statute provides, in pertinent part:

> The amount recovered in proceedings under this chapter shall be for the *exclusive benefit of the persons entitled to take any intestate personal property of the decedent,* and in the proportions in which they are entitled to take the same.

N.J.S.A. 2A:31–4 (emphasis added). No action lies in New Jersey for the death of another except by force of this statute. *See Turon v. J. & L. Const. Co.,* 8 N.J. 543, 558, 86 A.2d 192 (1952):

> the pecuniary loss ensuing from the death to others than the designated beneficiaries are not recoverable [under the statute]. A cause of action is created in favor of the persons thus designated, and if there be none such, there can be no recovery. It is their pecuniary injury that is to be recompensed, not the loss suffered by persons outside of the beneficiary class.... [T]he terms definitive of the persons or classes of persons for whom the remedy is provided are not to be expanded beyond their fair intendment.

*Id.* Defendants argue that "the Trump plaintiffs are not the 'fair intendment' and are improperly requesting the Court to expand the class of beneficiaries who may recover for wrongful death beyond the exclusive terms specified in the New Jersey wrongful death statute." DB at 11. We agree that plaintiffs are not the intended beneficiaries specified by the statute.

The law is well settled as to economic damages arising from wrongful death—only statutory beneficiaries may recover such damages. The concern "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct," 495 A.2d at 111, was reconciled by the legislature long ago. The legislature declared that the universe of wronged persons entitled to recover for wrongful death does not include employers. Thus, although plaintiffs did suffer purely economic damages, they are barred from recovery for those damages because inescapably those damages are rooted in the

death of their employees and only statutory beneficiaries may recover for wrongful death.

### A. Plaintiffs Have Asserted a Wrongful Death Action

Plaintiffs reject comparison of their claims to a wrongful death action. "In a nutshell, the Trump plaintiffs are not attempting to recover wrongful death damages, but seek instead to recover for the massive economic losses, including lost profits, sustained as the result of the Agusta defendants' tortious misconduct." PB at 14–15. Moreover, plaintiffs argue, the cases from other jurisdictions that bar recovery by an employer for damages arising from *injuries* to their employees have done so in the context of negligent injury, and not the intentional misconduct alleged here. *Id.* at 15. (Plaintiffs do not address whether the distinction between negligent and intentional injury survives the death of the employee, but we conclude that it does not.)

Plaintiffs address the distinction between injury and death only cursorily. They reject the importance of the distinction by arguing that their cause of action is not governed by the New Jersey wrongful death statute, but rather derives from the contractual relationship to their deceased employees:

> The [wrongful death] statute designates certain beneficiaries who are to recover by virtue of their familial relationship to the deceased. *See* N.J.S.A. 2A:31–4 (West 1987). The Trump plaintiffs' claims, on the other hand, are not based on social status but on their contractual relations to the deceased employees. Although it has been said [and held] that a master cannot recover for lost services because an expectation of services ends when the servant dies, the Trump plaintiffs' contractual obligations to the decedents did not end with the fiery helicopter crash in Lacey Township. The plaintiffs have been required to make salary and workers compensation payments under the terms of the respective employment agreements without having the continued benefit of the services of these highly valued executives. Because plain-

tiffs' claims arise by virtue of contract and not by operation of law, this argument [that the wrongful death statute controls this case] should be disregarded.

PB at 22 (citation omitted). Plaintiffs argue that their claim is not a wrongful death action because their link to their employees is contractual, not familial. Plaintiffs here attempt to transform what is a bar to their recovery into the means to redefine their claim and so avoid the bar. However, that they do not have the statutorily mandated link to the deceased which would entitle them to recover under the wrongful death statute does not alter the fact that this action is grounded in the allegedly wrongful death of their employees. Plaintiffs' "contractual obligations"— salary and worker's compensation payments—along with their damages, all arose from the ashes of "that fiery helicopter crash" that killed their employees. However described by plaintiffs, this is a wrongful death action.

As defendants point out, merely because the complaint does not "allege a cause of action for wrongful death does not alter the fact that these claims are brought to recover damages sustained by reason of the death of the employees." DB at 5. *See Western Goals v. Union of Soviet Socialist Republics (U.S.S.R.)*, MDL No. 565, Misc. No. 83–0345, Docket No. 83–8399 (D.D.C. Feb. 25, 1985):

> The plain meaning of a wrongful death action is a claim brought to recover pecuniary losses occasioned upon death tortiously caused by a third party. It is the means by which the burden of loss is shifted, as much as possible, from the innocent survivors to the responsible party. Plaintiffs['] action presents precisely such a claim and is a wrongful death action.

*Western Goals*, slip op. at 4.

Many courts have considered the issue and held uniformly that an employer has no cause of action for damages arising from the wrongful death of an employee. This is so because the right to recover for the wrongful death of another is exclusively

statutory. *See, e.g., Preiser Scientific, Inc. v. Piedmont Aviation, Inc.,* 432 F.2d 1002 (4th Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971) (affirming district court's dismissal of complaint seeking damages for loss of services of employee killed in crash of defendant's airplane, since corporation had no cause of action arising from death of its employee under common law or West Virginia statute); *Harris Corp., Data Communications Division v. Comair, Inc.,* 510 F.Supp. 1168, 1170 (E.D.Ky.1981) ("actions for wrongful death, since they did not exist at common law, are solely the creatures of statutory or constitutional provisions"), *aff'd,* 712 F.2d 1069 (6th Cir.1983); *Arrow Electronics, Inc. v. Stouffer Corp.,* 117 Misc.2d 554, 458 N.Y.S.2d 461 (Sup.Ct. 1982); Anno., Employer's Right of Action for Loss of Services or Like Against Third Person Tortiously Killing or Injuring Employee, 4 A.L.R. 4th 504 (1981).

In *Arrow Electronics,* 13 employees of Arrow perished in a 1982 hotel fire and the corporation sued for damages arising from, among other things, lost profits, loss of management and the costs of recruiting new management (damages similar to those alleged here). The court dismissed the complaint after concluding that the right to recover for the wrongful death of another is governed exclusively by wrongful death statutes under which corporations are not designated statutory beneficiaries. The court rejected an argument similar to that made by plaintiffs here:

Plaintiff urges that this is not a wrongful death action but an action for injury to the corporate plaintiff. However, this is, no matter how ingeniously disguised, a wrongful death action.

*Id.,* 458 N.Y.S.2d at 463.

In *Harris,* the court held that a corporation may not recover damages sustained when an employee dies in an aircraft accident, regardless of how the claim is pleaded:

The problem with the plaintiff's death claim is that it is well established that actions for wrongful death, since they did not exist at common law, are solely

the creatures of statutory or constitutional provisions.

*Harris,* 510 F.Supp. at 1170 (footnotes omitted).

Thus, plaintiffs' wrongful death claims are barred.

c) *Count VI—Willful Destruction And Spoilation Of Evidence, And Breach Of Agreement To Preserve Trial Evidence And Fraud*

■ Plaintiffs concede that New Jersey has yet to recognize the "evolving tort" set forth in Count VI. They urge the court, however, to permit them to go forward with their claim, on the basis that New Jersey tort law is progressive. "It is certainly likely ... that New Jersey courts would permit a cause of action sounding in tortious spoilation of evidence, particularly where plaintiffs have a valuable probable expectancy in the prospective litigation, which expectancy has been severely diminished by defendants' destruction of evidence." PB at 31. We decline plaintiffs' invitation to create a new cause of action, believing that role is better suited to New Jersey state courts. Therefore, we need not set forth the facts upon which this claim is based. The claim will be dismissed.

d) *Count VIII—Willful, Intentional Interference With Contractual Employment Relations*

■ Agusta moves to dismiss Count VIII under Rule 12(b)(6). In support of this claim the complaint states the following:

94. Long prior to October 10, 1989, the Defendants knew that the unreliability as a result of manufacturing and design defects in the main rotor blades, unless corrected, was going to result in a catastrophic blade failure and loss of the helicopter at some time in the future.

95. The Agusta Defendants knew, as a result of the prior failure in another helicopter in virtually the same spot as the accident helicopter[,] as well as other failures in other rotor blades well below their design life limit, that it was likely

that a main rotor blade failure would occur in-flight, which had an extreme likelihood of serious personal injury or death to the helicopter occupants.

96. The Agusta Defendants knew with certainty that unless the helicopter rotor blades were changed or that eddy current inspections or other tests were performed on a regular short term basis, cracks would develop from the inside of the rotor blades out or vice versa and that sudden, unanticipatable rotor blade failure would occur, resulting in serious personal injury or death.

97. In spite of that knowledge, and with a high degree of probability that a main rotor blade failure would occur and would result in serious personal injury or death, the Agusta Defendants did intentionally, deliberately, and without hesitation expose[ ] the Plaintiffs' employees to physical and emotional harm, resulting in a harmful and offensive contact to their persons.

98. The Agusta Defendants had reason to know that such injuries and death would inevitably result to employees of businesses that regularly chartered the helicopter and for which role such helicopters were regularly sold and promoted for sale and use, and that their death would result in damage to their employers' businesses.

99. The willful conduct of the Defendants had as its practical effect the intentional and wanton interference with the employee relations between Plaintiffs and their employees, entitling the Plaintiffs to punitive damages.

Compl. ¶¶ 94–99.

"[T]he bare elements of the tort of malicious interference with contractual relations are actual interference with a contract plus proof of the malicious nature of that interference." *Norwood Easthill Associates v. Norwood Easthill Watch*, 222 N.J.Super. 378, 536 A.2d 1317, 1320 (A.D. 1988), *citing Raymond v. Cregar*, 38 N.J. 472, 479–80, 185 A.2d 856 (1962). "Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right." *Louis Schlesinger Co. v. Rice*, 4 N.J. 169, 72 A.2d 197, 203 (1950).

> Merely to persuade a person to break his contract may not be wrongful "in law or in fact"; but if "the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it."

*Id.* (citation omitted). The parties agree that "[t]his cause of action requires that the plaintiffs establish that the conduct of the defendants was wanton, malicious, and unjustifiable." PB at 23; DB at 15–16; *Kurtz v. Oremland*, 33 N.J.Super. 443, 455, 111 A.2d 100, *aff'd*, 16 N.J. 454, 109 A.2d 286 (1954).

Defendants argue that "[t]he requisite elements of malice and intention are not present in this case. There is no allegation that the Agusta defendants knew on October 10, 1989 that plaintiff's employees would be on board an Agusta helicopter and it would be preposterous to suggest that the Agusta defendants had any knowledge of the employment terms between the Trump plaintiffs and the decedents." DB at 16. (We note that under *Schlesinger*, intention is part of malice.)

Plaintiffs respond: "The issue here is not whether plaintiffs can prove at trial whether the Agusta defendants knew of the Trump plaintiffs' contractual relationship with the decedents, but whether plaintiffs have pleaded a legally sufficient cause of action." PB at 24. Plaintiffs argue that discovery will enable them to establish "that the Agusta defendants knew that the inevitable and proximate result of their failure to take action would be personal injury or death" among an "exclusive and limited audience" of "corporate and V.I.P." customers, and plaintiffs' deceased executives were of that class. *Id.*

In other words, Agusta knew: (1) a helicopter blade would fail on one or more of its A109 helicopters; (2) because of that failure a helicopter would crash; (3) the crash would injure someone; (4) the injured person probably would be a corporate executive, a victim of Agusta's marketing. But there is no allegation that Agusta knew that any of plaintiffs' employees might possibly be injured, much less that Agusta intended thereby to injure plaintiffs.

Plaintiffs assert that they have alleged malice: "the Agusta defendants promoted and marketed the A109 as safe for executive use, notwithstanding their actual knowledge of the dangers inherent in its manufacture which made the helicopter unairworthy and unfit for flight as represented. Despite this actual knowledge and solely for their own pecuniary benefit, the Agusta defendants were silent when there was duty to speak. It is this deliberate silence, and not any mistake or inadvertence, which constitutes malice, and forms the predicate for plaintiffs' theory of recovery." PB at 26.

This is merely a statement of general malice, if you will, not in the least directed at the contractual relationship between plaintiffs' and their deceased executives, the focus of the claim of malicious interference. The type of malice to be demonstrated must be against plaintiffs, not the entire corporate world. Malice is specific, not general. And as it pertains to interference with a contractual relationship, it must be specific to that contract. Yet there is no allegation in the complaint that Agusta was aware of the contractual relationship between plaintiffs' and their deceased executives, nor even that Agusta was aware that plaintiffs used the services of an Agusta A109 helicopter, and so were potentially exposed to injury.

It is a simple proposition that a person cannot intentionally interfere with a contract that he knows nothing about. In order to subject someone to liability under this tort, the individual must have knowledge of the contract with which he has allegedly interfered. Restatement of Torts (Second) § 766, comment i (1977). *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.,* 729 F.Supp. 1035, 1051 (D.N.J.1990). The complaint fails to allege that Agusta had such knowledge. Plaintiffs therefore have failed to state a claim for "willful, intentional interference with contractual employment relations" and Count VIII of the complaint will be dismissed.[4]

## IV. CONCLUSION

For the foregoing reasons, we will deny plaintiffs' motion to remand, grant summary judgment for defendants on plaintiffs' claim for reimbursement of worker's compensation benefits, and dismiss plaintiffs' damages claims as set forth in the eight counts of the complaint.

---

**4.** Plaintiffs argue that should the court conclude that the "allegations in the Trump plaintiffs' complaint do not fit neatly into the confines of the [above] tort," the court has a "duty under Rule 12(b)(6) to examine the complaint to see if it provides a basis for relief under any possible theory, even if the allegations do not necessarily support the particular legal theory advanced." PB at 24. We are unable to construct a claim from the allegations of Count VIII.